**ATCHISON, T. & S. F. R. CO. et al. v. STATE et al.**

No. 12072—Opinion Filed July 26, 1921.

(Syllabus.)

1. **Carriers—Rates for Switching Service—Reasonableness.**

A careful examination of the evidence establishes that the service rendered by the railway companies in this case was a switching service; that the rate heretofore charged by the railway companies was exorbitant and excessive.

2. **Corporation Commission — Duties and Powers.**

The State Corporation Commission is established and its powers are defined by the Constitution of the state. Among its duties, it exercises the authority of the state to supervise, regulate, and control public service corporations, and to that end it has been clothed with legislative, judicial, and executive powers.

3. **Same—Orders of Commission—Presumptions—Appellate Jurisdiction.**

An appeal may be taken by the corporation whose rates are affected or by any person or corporation deeming themselves aggrieved by such action, and such appeal shall be of right and shall be taken to and reviewed by the Supreme Court only. The jurisdiction of the Supreme Court on such appeal is to consider and determine the reasonableness and justness of the action of the commission appealed from, or any other matter arising under such appeal. The order of the commission or rate fixed by it shall be regarded as prima facie just, reasonable, and correct; if in the opinion of the court the evidence taken before the Corporation Commission and certified to the court overcomes this prima facie presumption, it is then the duty of this court to make such order or fix such rate as it deems just, reasonable, and correct.

4. **Carriers — Freight Rates — Order of Corporation Commission — Modification.**

On an examination of the record, the order of the commission and the evidence, we

think the rate fixed by the Corporation Commission should apply to all crushed rock, gravel, and sand transported by the railway companies in the territory covered by the rate, and that the order should be modified to that extent.

Appeal from Corporation Commission.

Proceedings by the Standard Paving Company and J. T. Lantry against the Atchison, Topeka & Santa Fe Railway Company and others for adjustment of freight rates. From order of the Commission, the railway companies appeal. Order modified, and, as modified, affirmed.

Cottingham, Hayes, Green & McInnis, M. D. Green, O. E. Swan, and Kleinschmidt & Grant, for appellants.

S. P. Freeling, Atty. Gen., for the State.

Henshaw & Hough, for appellees Standard Paving Company and J. T. Lantry.

MILLER, J. A complaint was filed by the Standard Paper Company and J. T. Lantry against the Atchison, Topeka & Santa Fe Railway Company, Chas. E. Schaff, receiver of Missouri, Kansas & Texas Railway Company, Midland Valley Railway Company, and St. Louis-San Francisco Railway Company, before the Corporation Commission asking that the Corporation Commission adjust and fix a rate to be charged by the defendant railway companies on gravel, crushed rock, cement, sand, and other road building materials to such a base as will not be prohibitive. The adjustment of rates asked for is to govern in the vicinity of Tulsa. A hearing was had before the Corporation Commission. It adjusted and fixed the rate on a basis of the length of the haul. The railway companies have joined in an appeal to this court from the ruling of the Corporation Commission, and appear here as appellants.

The railway companies make six assignments of error, as follows: ·

"1. The Corporation Commission of Oklahoma was without jurisdiction or authority to enter and promulgate said order No. 1855.

"2. The Corporation Commission erred in entering and promulgating order No. 1855.

"3. Said order No. 1855 of the Corporation Commission is unreasonable and unjust.

"4. Said order No. 1855 of the Corporation Commission is not based upon sufficient evidence and is contrary to law.

"5. Said order No. 1855 of the Corporation Commission is confiscatory and will result in depriving appellants and each of them of their property without due process of law, and without due compensation, contrary to the provisions of the Constitution of the United States and of the Constitution of the State of Oklahoma.

"6. Said order No. 1855 of the Corporation Commission fixes rates which are unduly low and discriminatory, and require these appellants to afford service to one locality and to certain shippers at materially lower rates than are prescribed for similar service to other localities, and to other shippers of the same commodities over the same route and distances in that locality."

Then they say:

"The various assignments of error above numbered may, for convenience, be considered together."

On the hearing before the Corporation Commission a number of witnesses testified, and a large amount of documentary evidence was offered in the form of rate schedules in force in different states. After considering this evidence the Corporation Commission made its findings of fact. It then promulgated its order No. 1855, which, omitting the caption, is as follows:

"This case being at issue upon complaint and answers on file, and having been duly heard and subjected by the parties and full investigation of the matters and things involved having been had, and the commission having on the date hereof made and filed a report containing its findings of fact and conclusions thereon, which said report is above referred to and made a part hereof:

"It is ordered, that the above named defendants according as they may participate in the transportation, be and they are hereby notified and required to cease and desist, on or before February 16th, 1912, and thereafter to abstain, from publishing, demanding, or collecting for the transportation of sand, gravel and crushed stone in carload lots, rates that exceed the rates for distances indicated in the following table from points of origin within that radius to Tulsa and West Tulsa, for street paving and any point of origin or destination within that radius in Tulsa county, for road-building purposes for single line movements, and that one (1) cent be added to the single line rate for a two (2) line movement:

| 10 | Miles | and | Under | 2c | per | 100 | lbs. |
|----|-------|-----|-------|-----|-----|-----|------|
| 20 | " | " | Over 10 | 2½c | per | " | " |
| 30 | " | " | " 20 | 3c | | " | " |

"It is also ordered, that distances now published in Oklahoma Mileage Table No. 1-B Supplements thereto or re-issues thereof be used in applying such charges.

"It is Further Ordered that the rates above designated shall be published on or before the 16th day of February, 1921, upon notice to this commission and to the general public by not less than one (1) day, and that they shall continue in effect for the period of one year from the effective date of this order, unless sooner changed or canceled by this commission.

"Done at Oklahoma City this the 5th day of February, 1921.

"Corporation Commission of Oklahoma.

"(Signed) Campbell Russell, Chairman."

"E. R. Hughes, Commissioner. Art · L. Walker, Commissioner.

"Attest:

"P. E. ·Glenn, Act. Secy."

The only thing that is necessary for this court to determine is the reasonableness and justness of the action of the commission appealed from. The rate fixed by the Corporation Commission for the purpose of this appeal shall be regarded as prima facie just, reasonable, and correct; if in the opinion of the court the evidence taken before the Corporation Commission and certified to the court overcomes· this prima facie presumption, it is then the duty of this court to make such order or fix such rate as it deems just, reasonable, and correct. St. Louis-San Francisco R. Co. v. State, 81 Okla. 298, 198 Pac. 73.

There are many things urged by the appellants: That the rate is an unjust discrimination in favor of a certain class of shippers; that it is an unjust discrimination in favor of certain localities, to wit, Tulsa; that by a comparison of rates it is unjust. The appellants also claim that the rate was made for the purpose of relieving the complainants from loss they claimed they would sustain by reason of certain contracts they had already made. We think the order of the Corporation Commission should be modified, and the modification we will make will dispose of all of these contentions.

The findings of fact of the Corporation Commission are in part as follows:

"The evidence introduced by the complainants show that the present rates on sand and gravel for short hauls are unreasonable and unjust, considering all matters and things involved. At the opening of the hearing the applicants dismissed the case in so far as the Chicago, Rock Island & Pacific Railroad was concerned, as it was not the purpose to bring in issue the rates as applied on cement from Hartshorne, Oklahoma, to points in Oklahoma.

"The evidence further shows that on or about May 22, 1919, the complainants and other contractors in Tulsa, Oklahoma, contracted to pave some of the country roads in Tulsa county, Oklahoma. These contracts were all made after the Director General issued circular No. 9, which directed that on all sand, gravel, crushed rock and other road building material consigned to and the freight paid by federal, state, county, parish, township or municipal authorities. the rate would be ten cents per ton less than regularly published tariff rates in effect for the transportation of these materials or commercial uses at the time shipments moved but with minimum charge of forty (40) cents per net ton. This made the rate for haul of ten miles under Frisco Tariff 1199-Series, on shipments moving from Price-Switch and Garnett, which are within a radius of ten miles of Tulsa, 2½c per 100 lbs. Quoting from defendant's witness (Mr. Conley) he stated as follows:

"'On or about September 25, 1918, we published between Kengle-Prices spur and Crusher spur (opposite Price spur) to points within switching limits of Tulsa, Oklahoma, five miles and under 2c per cwt., ten miles and over five 3c per cwt., on sand and gravel and 2½c and 3c on crushed stone, which rates continued in effect until the recent 35% increase which brought these rates up to 2½c per cwt. for distances under five miles, which really means from these various producing points to West Tulsa, and 3½c for distances ten miles and over five miles, which really means Tulsa proper. These rates are still in effect, and as the commission understands 1 1-2c for five miles and under and 1-2c or ten cents per ton below the minimum tariff scale in effect throughout the state of Oklahoma for ten miles and over five on these various commodities, i. e., sand and gravel, and 1-2c below tariff on crushed stone for five miles and less.'

"As a further illustration of the rate situation and history covering the rates specifically mentioned above and the rates for distances in excess of the distance covering these rates. the following tabulation extracted from exhibits on file is made a part of this finding:

Stone and Gravel.

| Miles | Columns 1 Rate Sect. | 1 | 2 | 3 | 4 | Columns 2 Rate Sect. | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 and under 2 | 40c | $20 | 30c | $15 | | 2.5 | 50c | $25 | 40c | $20 |
| 10 and over 5 | 2.5 | 50 | 25 | 40 | 20 | 3.5 | 70 | 35 | 60 | 30 |

Crushed Stone.

| Miles | Columns 3 Rate | | | | | Columns 4 Rate | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 and under 2.5 | 50c | $25 | 40c | $20 | | 3.5 | 70c | $35 | 60c | $30 |
| 10 and over 5 3 | 60 | 30 | 50 | 25 | | 4 | 80 | 40 | 70 | 35 |

Sand and Gravel & Crushed Stone.

| Miles | Columns 5 Rate | | | | | Columns 6 Rate | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 and under 2 | 40c | $20 | 30c | $15 | 3 | 60c | $30 | 50c | $25 | |
| 10 and over 5 2 | 40 | 20 | 30 | 15 | 3 | 60 | 30 | 50 | 25 | |
| 15 and o'r 10 2 | 40 | 20 | 30 | 15 | 3 | 60 | 30 | 50 | 25 | |
| 20 and o'r 15 2 | 40 | 20 | 30 | 15 | 3 | 60 | 30 | 50 | 25 | |

| Miles | Columns 7 Rate | | | | Columns 8 Rate | | | |
|---|---|---|---|---|---|---|---|---|
| 5 and under 4 | 80c | $40 | 70c | $35 | 80c | .16 | 70c | .14 |
| 10 and over 5 4 | 80 | 40 | 70 | 35 | 80 | .08 | 70 | .07 |
| 15 and o'r 10 4 | 80 | 40 | 70 | 35 | 80 | .053 | 70 | .046 |
| 20 and o'r 15 4 | 80 | 40 | 70 | 35 | 80 | 04 | 70 | .035 |
| 30 and over 4.5 | 90 | 45 | 80 | 40 | 90 | 06 | 80 | .026 |

Columns 1 and 3 cover rates published in Frisco Tariff 1199-U and V 9-10-1919 to 9-10-1920.

Columns 2 and 4 cover rates published in Frisco Tariff, 1199-W from 9-10-1920 to 12-20-1920.

Column 5 covers rates published in Leland's Tariff 55-d March 25, 1918.

Column 6 covers rates published in Leland's Tariff 55-d June 25, 1918.

Column 7 covers rates published in Leland's· Tariff 55.F September 10, 1920.

Column 8 Shows rate per ton per mile effective September 10, 1920.

Sect. 1, Columns 1 to 7. both inclusive rates in cents per ton.

Sect. 2, Columns 1 to 7, both inclusive rates in cents per ton less 10c per ton.

Sects. 2 and 4, Columns 1 to 7 both inclusive.

Car earnings based, upon 100,000 pounds capacity.

Sect. 2 in Column 8 Rate in cents per ton per mile based on present rates.

Sect. 3 Column 8 in cents per ton per mile based on present rates, minimum 10c per ton.

"The rate now in effect under Frisco 55-F, is 4c per 100 lbs. for all distances 25 miles and under and 4.5c for thirty. (30) miles, or double the rate applied to movement of sand and gravel for road building purposes as fixed by the Director General of Railroads, which was in effect at the time the contracts of complainants were made.

"There was no evidence submitted by the defendants to support the reasonableness of the rates in effect other than they had been increased for the short-haul from two to three cents per hundred and from three to four cents per hundred, in compliance with general order No. 28 of the Director General and 35 per cent. under the increase granted by the Interstate Commerce Commission in Ex Parte 74, the latter increase being authorized for application on intrastate business in commission's order 1781.

"The evidence shows that some of the gravel pits from which these commodities are shipped was, at one time, within the switching limits of the Frisco Railroad. This, it is claimed, by the Frisco, as in error and soon thereafter corrected.

"It was also shown from the evidence that the sand and gravel from the various gravel pits involved are within less than ten miles of the destination of the shipments in Tulsa, and not to exceed fifteen miles to the point of unloading for use on the county roads, on a single line haul, and that, so far as the Frisco is concerned, the same is handled with an engine operated for this purpose which, in the absence of cars, does other switching in and about the yards at Tulsa.

"The rates in Oklahoma for the past few years are as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| For the year 1908 | On | 5 | Miles | 1 | c | per | 100 | lbs |
| For the year 1911 | " | " | " | 1.5 | " | " | " | " |
| For the year 1918 | " | " | " | 2 | " | " | " | " |
| From June 25 1918 | " | " | " | 3 | " | " | " | " |
| From Sept. 10 1920 | " | " | " | 4 | " | " | " | " |
| For the year 1908 | On | 10 | Miles | 1.3c | per | 100 | lbs | |
| For the year 1911 | " | " | " | 1.8 | " | " | " | |
| From 1st part 1918 | " | " | " | 2 | " | " | " | |
| From last part 1918 | " | " | " | 3 | " | " | " | |
| From Sept. 10. 1920 | " | " | " | 4 | " | " | " | |
| For the year 1908 | On | 25 | Miles | 2 | " | " | " | |
| For the year 1911 | " | " | " | 2 | " | " | " | |
| From 1st part 1918 | " | " | " | 2 | " | " | " | |
| From last part 1918 | " | " | " | 3 | " | " | " | |
| From Sept. 10, 1920 | " | " | " | 4 | " | " | " | |

The rates in effect now on sand and gravel are as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Oklahoma | On | Dist. | 5 | Miles | 4 | per | 100 | lbs |
| Missouri | " | " | " | " | 2.5 | " | " | " |
| Texas | " | " | " | " | 3.5 | " | " | " |
| Kansas | ' | " | " | " | 2.3 | " | " | " |
| Louisiana | " | " | " | " | 2.5 | " | " | " |
| Oklahoma | " | " | 20 | " | 4 | " | " | " |
| Missouri | " | " | " | " | 4 | " | " | " |
| Texas | " | " | " | " | 3.5 | " | " | " |
| Arkansas | " | " | " | " | 3 | " | " | " |
| Louisiana | " | " | " | " | 2.5 | " | " | " |
| Oklahoma | " | " | 25 | " | 4 | " | " | " |
| Missouri | " | " | " | " | 4 | " | " | " |
| Texas | " | " | " | " | 4 | " | " | " |
| Arkansas | " | " | " | " | 3 | " | " | " |
| Louisiana | " | " | " | " | 2.5 | " | " | " |

"The above is the commercial rate applicable for any and all purposes. The rate in Oklahoma is the same for haul of five miles as it is for a twenty-five mile haul. The service rendered for a haul of over five miles is evidently greater than the service rendered for a haul of five miles. This inexplicable condition of the rates in Oklahoma was brought about by the various orders of the Federal Administration and the Interstate Commerce Commission at a time when the commission had no jurisdiction over the same, and this commission announced at the time the 35% increase was authorized that it would readjust and eliminate all discrimination and all unjust or unreasonable rates upon complaint in reference thereto.

"It is a well known fact that. for years prior to 1918 most of the carriers recognized applications for reduced rates covering road-building materials, these same carriers making application to this commission for such reduced rates. It is also evident that the Director General had in mind in permitting a reduction of 10c per ton, the actions of the railroads in the past in recognizing the value of reductions covering the rates for such material. The Interstate Commerce Commission, in passing upon the rate structure as a whole, in Ex Parte 74, apparently was confident that a general increase of a given per cent. would result in unreasonable rates in some instances, and stated in substance that where such inconsistencies are found to exist that they might be adjusted in a separate complaint. This commission had in mind the conditions that would prevail and reversed the right to make exceptions when it was found they did exist.

"Commission's order No. 1828 was issued on December 20th, 1920, to become effective January 20, 1921, but due to motion of carriers, involving a question of law, it was agreed by counsel for the complainants that the order be vacated and set aside on the grounds set out in paragraph four (4) of that motion, whereupon same was made void as of January 8th, 1921, and after reviewing the evidence supported by transcript the commission is of the opinion and finds:

"Considering all the circumstances in this case, the complainants herein having had contracts for the purpose of hard-surfacing roads and streets which they could have completed during the time the lower rate was in effect but for the inability of the carriers to furnish cars, and the further fact, that this sand and gravel, in many instances, is not handled by regular road freight trains which may have to stop at a station to pick up or set out a car at a time, but is handled

by what may be termed 'a special switch engine operating under road service rules and regulations' —yet the service performed partakes of the nature of a road haul and a switching service, but if classified solely by the service performed it would be termed 'out of yard limit switching service', the commission is of the opinion that a single line rate of 2c per 100 lbs. to be established for a period of one year for all distances of 10 miles or under, and 2½c per 100 lbs. for distances of 20 miles and over 10 miles, and 3c per 100 lbs. for all distances of 30 miles and over 20 miles from the gravel pits in question in this case, when the same is transported for road-building in Tulsa county or street paving purposes in the city of Tulsa, and when served by two lines of railroad or railway not under the same management and control one (1) cent be added for such two line haul, and these rates will be reasonable for such movements.

"The complainants also ask for a readjustment of the cement rates in Eastern Oklahoma, complaining that there is a discrimination. The commission will not make any adjustment of the cement rates under the evidence in this case, but will reserve the same for further hearing if the applicants so desire, that the adjustment asked for may be considered in its relation to other cement rates applicable in this state, also interstate rates.

"In view of the findings above, an order will be issued."

We think the findings of the Corporation Commission as to the reasonableness of the rate they have fixed is fully supported by the evidence. The evidence shows that these hauls are not regular road hauls, but are in the nature of a switching service. The service rendered by the railways is very similar to the service rendered by the Frisco at Ada, Oklahoma, as set forth in St. Louis-San Francisco Railway Co. v. State, supra. There the haul is five and five-tenths (5.5) miles. Based on a comparison of rates this court fixed the rate at 16.875c per ton. The rate fixed by order No. 1855 of the Corporation Commission fixes a rate of two cents per hundred pounds on hauls of ten miles and under. This amounts to forty cents per ton. This would be $20 per car for practically a switching service.

We quote from the testimony of J. M. Chandler, which is similar to other testimony offered before the commission.

"Q. Do you remember when these sand companies were within the switching limits of Tulsa? A. They are still being served by switch engines. The old limits were at one time half a mile west of us, and now it is half a mile east of us. Q. In moving this sand and gravel from your switch limits to the carriers, does it move over the main lines? A. Yes, sir. Q. Is that true of all of these sand companies, or do they have switches running out to it? A. Each plant is served by an individual line, but that breaks to the main line and the main line is used to Tulsa. Q. About what is the distance from Tulsa to these plants? A. As I say, they are all three lined up right together. The more easternly plant is not more than 1,000 feet from the most westernly plant. Q. The rate is the same for all the plants? A. The Kendall plant is a little less than five miles, and the Price plant is 5.1 miles. Q. What is the difference in the rate, if any? A. One cent. Q. That is $5 per car? A. About $10 per car. Q. Then the difference between those plants is less than a quarter of a mile? A. Yes, sir. Q. And there is $10 per car difference in the rate? A. Yes, sir. Q. You may go ahead and state whatever you have in your mind with reference to this matter. Mr. Adams: Q. What is the output of your plant per day? A. 33 cars. Q. Could you load 33 cars per day if the railroad furnished the cars? A. Barring accidents, yes. Q. Did you have any trouble getting cars during December, 1919? A. Yes, sir. Q. Do you recall a conversation we had with Mr. James, of the Division of Traffic of the United States Railroad Administration during Christmas, 1919? A. Yes, sir; I may state that the conditions in 1919 were particularly annoying and that there was a large surplus of equipment standing idle in the terminals at Tulsa. I believe I am not exaggerating when I say there was an average of from 350 to 500 cars standing idle for three weeks, during which time our plants were idle because we did not have any cars. Q. There was an embargo to keep from using any of those cars for anything except coal? A. Yes, sir. Q. What was Mr. James doing there? A. There were a good many jobs that could not be completed for a lack of material and the Traffic Association, together with a good many others, took the matter up with Judge James and he took the matter up with Washington. I do not know what action was taken, but soon after that we got the cars. Q. Your plant is handled by switch engines? A. Yes, sir. Q. Can you state how many cars of sand you loaded out of your plants during the first seven months of this year? A. 2,236 cars. Q. What is the tonnage? A. 109,326 tons. Q. That is an average load per car of fifty tons? A. Yes, sir, approximately. Q. On a 3.5 cent rate that would cost $35 per car? A. Yes, sir. Q. If you could get the complete loading of your plant, that would make each track pulled out of your plant, if they furnished full equipment, about $1,155 per trip? A. Approximately, yes. Q. The switch engine that serves your plant—can you say whether this switch engine is paid on road haul or switching rates? A. They are paid just the same as any other trains. They come out

and are there about two and a half hours and they having work orders from the limits to our plants. Q. They get paid the standard wage for a switch engine crew? A. Yes, sir. Q. How much time will a switch engine consume in going out there? A. An average of two hours. Q. Have you any idea of what it would cost to operate a switch engine per day? A. I have an idea your estimate this morning of $100 is approximately correct. Q. And two hours per day of hauling ·those cars in would mean an actual outlay of $20,000 per day to get a return of $1,120.00? A. Yes, sir; if the switch engine expense ·was all. I would not think that was just exactly a fair way of figuring it myself. Mr. Henshaw: As far as this particular service is concerned it is no different from any other switching service other than that they have to have orders on the main line? A. No, sir; that is all. Q. Do you know how long your plants were within the switching limits of Tulsa? A. Just a short time. They were first served by road crews exclusively and then it was considered that it would be more advantageous to serve us with a switcher and they moved the limits out there and, for some reason, they were required to move it back. Q. That is all."

Adams Exhibit No. 1 CLL covers rates on mileages up to two hundred miles. We quote from same to a limit of forty miles, as that is sufficient to cover the questions presented in this appeal:

Adams Exhibit No. 1, CLL
Rates on Sand, Gravel and Crushed Stone from No. No. 4059.

| Miles | Aug. 29. 1908, 8-29-08 | 1911 | to Oct. 1. 1920. 3-25-18 | 6-25-18 | 9-10-20 |
|---|---|---|---|---|---|
| 5 | 1 | 1.5 | 2 | 3 | 4 |
| 10 | 1.3 | 1.8 | 2 | 3 | 4 |
| 15 | 1.6 | 2 | 2 | 3 | 4 |
| 20 | 1.9 | .2 | 2 | 3 | 4 |
| 25 | 2 | 2 | 2 | 3 | 4 |
| 30 | 2.1 | 2.5 | 2.5 | 3,5 | 4,5 |
| 35 | 2.2 | 2.5 | 2.5 | 3.5 | 4.5 |
| 40 | 2.3 | 2.5 | 2.5 | 3.5 | 4.5 |

E. N. Adams testified that since 1913 he had been traffic manager of the Tulsa Traffic Association, and prior to that time he had been connected with a number of large railroads in the freight claim and traffic and general office work; that he prepared the Exhibit No. 1 above referred to. He further testified as follows:

"Q. We will have the reporter mark that as your exhibit No. 1 (Adams Exhibit No. 1, filed and made a part of the record herein). State briefly what your Exhibit No. 1 is. A. A history of the rates on sand, gravel and crushed rock from August 29, 1908, to October 1, 1920. Q. On the first column is what? A. Tariff 54 of the Southwestern Tariff Committee. effective August 29, 1908. Q. That column shows the rates applicable for the distances set forth at that time? A. Yes, sir. The table of miles is shown at the extreme left. Q. When was the rate changed and how? A. Order 515 of the commission, effective in 1911, made a slight advance in the rates. Then we had Tariff 55-D effective March 25, 1918. Q. That was put in by the carriers? A. That is what we call an arbitrary tariff filed by the carriers. Q. After Judge Youman had granted an injunction? A. Yes, sir. Q. What was the next change? A. Effective March,1919, the Railroad Administration increased the rates ·on those particular commodities 1 cent per 100 pounds, and again there was another increase by the State Commission, effective September 15, 1920, which carries out the decision of the Interstate Commerce Commission in Ex Parte 74. Q. It was an increase of 35 per cent.? A. An increase of 35 per cent. Q. Making the present rate for haul of five miles how much? A. Four cents per hundred. Q. Or 80 cents per ton? A. Yes, sir. In other words, the arbitrary tariff increased the rates from one cent to two cents and the general order increased it to three cents and Ex Parte 74 increased it to four cents, so during the time starting with August 29, 1908, with the five mile rate at one cent, those rates have been increased ·to four cents. Q. That is for sand and gravel? A. Sand and gravel and crushed rock. Q. Crushed rock, too? A. Yes, sir. Q. I wish you would state the conditions surrounding this service. Just tell what service the carriers do and the conditions there at Tulsa, or the zone in which you are asking for this adjustment. A. Kingle Brothers and Gray are located west of Tulsa on the Midland Valley Railroad within the ten mile limit. Those points produce sand and crushed rock, and on the main line of the Frisco to the North we have Garrett within ten miles, which produces crushed rock. With the exceptions of Gray, all of the cars loaded at any of these points are handled in the switching service. That is, the movement is such that we believe the carriers have found it to their interest to have this traffic handled by switch engines. Q. What is the volume of the traffic? A. The capacity of the plant of the Price Sand Company is 32 cars per day, and with a rate of four cents per hundred, which is now in effect, would make a revenue on the average car $40.00. For the first seven months of this year that was the average load per car, fifty tons, or 100,000 pounds. The Price Sand Company would load the entire capacity of the plant if they could get the equipment. That would make the Price and Kengle spur bear freight charges of over $1,280 on each trip. Q. How many trips can a switch engine make every day? A. There is only one loading per day. Q. How much of the time would it take to make this service? A. Even if it took the switch engine the entire day to perform the work, the expense, I do not believe, would be in excess of $100.00. I believe that is what the carriers figure it costs them to operate

a switch engine for a day of ten hours."

Appellants contend that Adams Exhibit No. 1, supra, was not admissible and should not be considered, because an injunction was granted by the federal court while certain of the rates shown by Adams Exhibit No. 1 were in effect. The evidence shows that order No. 515, made in 1911, was in effect at the time Judge Youman granted the injunction, and that is shown in the second column of rates in Exhibit No. 1. Following the injunction the railway companies put into effect Tariff 55-D, effective March 25, 1918, which was called an arbitrary tariff filed by the carriers. That is shown in the third column of rates in Adams Exhibit No. 1. After a careful examination of the evidence submitted to the Corporation Commission, we are convinced that the rate fixed by the Corporation Commission is just, reasonable, and correct, except that it should apply to all sand, gravel, and crushed stone, whether used for road-building or street-paving purposes or in strictly commercial lines.

The order will be modified as follows:

"It is ordered that the above named defendants, according as they may participate in the transportation, be and they are hereby notified and required to cease and desist, on or before February 16th, 1921, and thereafter to abstain, from publishing, demanding, or collecting for the transportation of sand, gravel and crushed stone in carload lots, rates that exceed the rates for distances indicated in the following table from points of origin within that radius to Tulsa and West Tulsa, for single line movements and that one cent be added to the single line rate for a two line movement:

| 10 | Miles | and | under | 2c | per | 100 | lbs. |
| 20 | " | " | Over 10 | 2½c | per | " | " |
| 30 | " | " | " 20 | 3c | per | 100 | lbs. |

"It Is Ordered, that distances now published in Oklahoma Mileage Table No. 1 - B Supplements thereto or reissues thereof be used in applying such charges.

"It is Further Ordered, that the rates above designated shall be published on or before the 16th day of February, 1921, upon notice to this commission and to the general public by not less than one (1) day, and that they shall continue in effect for the period of one year from the effective date of this order unless sooner changed or cancelled by the commission.

"Done at Oklahoma City this the 5th day of February, 1921."

We think this disposes of all of the questions necessary to dispose of in deciding this case. The contention of the appellants that the rate is a special rate and discriminates in favor of Tulsa and vicinity is not well taken, for the reason that this record does not show that any other place has similar conditions. If a showing is made to the Corporation Commission that any other place within the state of Oklahoma is similarly situated, so that it would be entitled to the rate fixed by this order, on a showing made to the Corporation Commission, we assume, the Corporation Commission will fix such rate as will be just, reasonable, and correct, so that this rate would not discriminate in favor of Tulsa and vicinity as against any other place where conditions are similar.

As modified, the order of the Corporation Commission is hereby affirmed.

PITCHFORD, V. C. J., and JOHNSON, ELTING, and KENNAMER, JJ., concur.