SOUTHWESTERN BELL TELEPHONE CO. v. STATE et al.

No. 26340.    July 13, 1937.

Rehearing Denied Sept. 14, 1937.

J. R. Spielman, John H. Cantrell, and E. W. Clausen, for plaintiff in error.

Holmes Baldridge (J. B. A. Robertson and Arthur Holloway, of counsel), for defendants in error.

BAYLESS, V. C. J. This is an appeal from an order of the State Corporation Commission and involves Southwestern Bell Telephone Company, a corporation. The commission began a general investigation of the rates, charges, and practices of 'all telephone companies within the state of Oklahoma, under one general cause. This cause was divided into divisions, and division III is involved herein 'and is concerned with the reasonableness of the rates charged for telephone service at Tulsa, Okla. The hearing resulted in an 'order for a reduction of 25 cents per month, or $3 per year, for one-party, two-party, and four-party residential telephones in Tulsa. The company appeals, asserting that the reduction results in confiscation of its property by virtue of establishing inadequate rates.

Th company makes three assignments of error, two of which are argued under subheads. We are considering these assignments in a different order, and we will dispose of III first, II next, and I last.

Proposition III. "The commission exceeded its authority and jurisdiction in vacating its former order No. 8335, and granting a rehearing and substituting therefor order No. 8666. complained of in this cause."

This cause was heard at great length; only one of the members of the commission heard the evidence. After the parties had closed, the matter was taken under consideration. and on December 10, 1934, the commission filed and entered Order No. 8335, which denied any reduction in rates for the Tulsa exchange. This order was signed by two members of the commission only. December 26. 1934, A. F. Sweeney, a citizen of Tulsa, Okla., filed motion to set aside order 'and for rehearing or consolidation with Cause No. 11803, and on January 16, 1935, the city of Tulsa, Okla., a municipal corporation, filed a petition for rehearing and oral argument. Upon consideration of these pleadings the commission made an order on January 22. 1935, granting the relief sought in those pleadings and set the cause for further hearing. Between the date of the order in December and the order in January, Commissioner Hughes, who signed Order No. 8335, had gone out of office and had been succeeded by Commissioner Shaw. Neither of these commissioners heard the evidence. Upon further consideration of the matter the commission made and entered Order No. 8666, from which this appeal arises.

The contention is made that the commission was without authority or jurisdiction to grant a rehearing and to substitute another order for the final order theretofore made. In other words, the company contends that when the commission has held a hearing, and has received evidence, and upon consideration thereof finds and orders certain matters, it thereupon has made a final order disposing of the cause, and the commission is without power to review what it has ordered. To follow this one step further, it means that an order once entered is conclusive, unless reversed on appeal, and a new proceeding is necessary to authorize a different order.

The company insists there is no express grant of power to the commission to review its orders, 'and the opponents admit this. However, opponents insist there is implied power to this in respect to the. powers and duties devolving upon the commission. The company denies this.

It is needlessly repetitious to say that executive, legislative, and judicial powers and functions are given the commission. It is this co-existence of inconsistent functions which renders the question difficult.

A hearing to determine a rate for a public utility is a legislative proceeding. Prentice v. Atlantic Coast Line Co., 211 U. S. 210, 53 L. Ed. 150. But it is obvious that the organization of the commission for the hearing, the general course of the procedure, and the ultimate action of the commission more nearly approximates a judicial proceeding. An appeal follows, in which the reasonableness (correctness) of the finding and rate ordered is reviewed. A review of the action of a legislative body acting in a matter of legislation is unknown, except in special boards, whose duties and functions embody those pertaining to more than one of the governmental branches. However, it is not an answer to our question to say that a legislative body may repeal, amend or extend its legislation at its whim. There is implicit in a rate proceeding enough of the aspects of the orderly procedure inherent in due process of law to require that the matter of a review, by the body acting, approximate judicial procedure. Nevertheless, the rules applicable to courts in this

aspect may not be susceptible of strict or technical application,

The earlier opinions of this court on appeals from the commission disclose that the issue of review or rehearing has been considered. In the cases of A., T. & S. F. Ry. Co. v. Love, 23 Okla. 192, 99 P. 1081, and K. C. So. Ry. Co. v. Love, 23 Okla. 224, 100 P. 22, it was held that the filing of a motion for new trial and refusal thereof were not necessary to an appeal. This conclusion was reached upon considering the method of appeal set out in the Constitution as contrasted with the statutory method of appeal from trial courts by case-made. It was pointed out, however, that such motions were not expressly pro vided for.

In the case of A., T. & S. F. Ry. Co. v. State, 82 Okla. 288, 200 P. 232, it appears that the commission actually made an order, entertained, and granted a new trial, and upon consideration of points of law entered a second order. This was not assigned as error, but the procedure was not criticized or condemned.

In the case of St. L. & S. F. Ry. Co. v. Williams, 25 Okla. 662, 107 P. 428, a motion for new trial was filed and denied. Among the errors assigned on appeal was the refusal of the commission to grant a continuance of the hearing set. We said in our opinion:

"In order to have a reversal of the action of the commission in this respect, as no proper showing was made for a continuance at the time of the hearing, there should have been an affirmative and further showing by motion for the reopening of this case in order that it might defend. Whilst a motion for a new trial is not required in order to have the action of the commission reviewed by this court, yet, if, within proper time after this order has been made, a motion has been filed before the commission setting forth facts showing that this order was unreasonable and unjust, and that it did not have sufficient notice in which to meet the issue on which the order was entered, and that if it had been granted a continuance such defense would have been made, then the appellant would be in a position to complain here of the commission's action overruling the motion for a continuance of closing the case. The motion for new trial filed in this case does not set up any affirmative fact to show that it was prejudiced in not being granted a continuance."

In the case of Pioneer Tel. & Tel. Co. v. State. 40 Okla. 417, 138 P. 1033, in discussing the methods by which the orders of the commission could be attacked by an aggrieved party, it was said:

"Three remedies were available to the appellant by which the validity of said order might be challenged: (1) By appeal as provided in section 20 of art. 9 (sec. 238, Williams' Anno. Ed.) of the Constitution; (2d) by application made directly to the commission to set aside order (sec. 18 of art. 9 [sec. 234, Williams' Anno. Ed.] of the Constitution); and (3) by an action in equity to restrain its enforcement. As a matter of practice the first two remedies should be sought before the last remedy is resorted to. * * *"

In our opinion, "an application * * * to set aside order" means an application or motion for new trial, rehearing, review by the commission of its own action. All of these are synonymous.

"Ordinarily, a petition for rehearing is for the purpose of directing attention to matters said to have been overlooked or mistakenly conceived in the original decision, and thus invites a reconsideration upon the record upon which that decision rested." A.. T. & S. F. Ry. Co. v. U. S., 284 U. S. 248. 76 L. Ed. 273.

In other words, the authority making the decision reviews its own action to determine whether it erred. If it did err, it can withdraw its decision and make what it now conceives to have been the correct decision, provided a party is not prejudiced thereby.

In this case a full hearing had been conducted over a period of months, the parties had fully submitted their evidence, and after the first order was promulgated the commission was asked to reconsider the order on the theory that it had committed error. We can see no logical reason why the commission, in order to change the first order, should be required to conduct another hearing wherein substantially the same evidence would have to be reintroduced at a considerable cost as well as the time necessarily consumed. It is clear to us that within a reasonable length of time after an order has been promulgated, the commission may, if it becomes aware of its own error, rehear the matter and make a new order upon evidence proper to a consideration of the matter at that time and enter a corrected order, from which corrected order an aggrieved party may then appeal within a similar period of time. In other words, the power of the commission to rehear its matters and to correct errors which it believes it has made, is not to in anywise prejudice any party in his right of appeal.

Chapter 93, S. L. 1913, further extended the scope of the Corporation Commission's powers and duties so that it now has under its supervision and control many public utilities in addition to the transportation and transmission companies mentioned in the Constitution. It would be entirely in keeping with the commission's power and authority to promulgate rules and regulations concerning rehearings before it, which the parties might avail themselves of if they cared to. We have heretofore said that such a step is not necessary under the provisions of our Constitution, but since it is not forbidden and the commission seems to have been in the practice of entertaining such applications, the adoption of rules would clarify the matter in the minds of parties appearing before it.

Many Oklahoma cases are cited [A., T. & S. F. R. Co. v. State, 82 Okla. 288, 200 P. 232; Bromide Crushed Rock Co. v. Dolese Bros. Co., 121 Okla. 40, 247 P. 74; Oklahoma City v. Corporation Commission, 80 Okla. 194, 195 P. 498; City of Tulsa v. Corporation Commission, 96 Okla. 180, 221 P. 1000; Planters Cotton & Ginning Co. v. West Bros., 82 Okla. 145, 198 P. 855; Chicago, R. I. & P. Ry. Co. v. State, 158 Okla. 57, 12 P. (2d) 494; and H. F. Wilcox Oil & Gas Co. v. Walker, 168 Okla. 355, 32 P. (2d) 1044], to the general effect that the Corporation Commission has only such power and authority and jurisdiction as are conferred upon it by law. We have examined all of these cases and find the statement to have been made in every case in respect to substantive law. The issue before us is one of procedure, and we feel the decisions which we cited and quoted earlier in this discussion are more nearly in point on this issue.

The Corporation Commission did not act without the scope of its authority when it granted the rehearing, and reconsidered the record and entered a new order.

Proposition II. "The findings concerning value by the commission are the result of the adoption of illegal methods and the failure to give proper weight to the elements necessary to be considered in valuing public utilities' property."

This proposition is divided into several subheads, relating to value, deduction for depreciation reserve, working capital, going concern value, reproduction cost new, and Western Electric prices.

The first is somewhat general, having in mind the effect upon the present fair value figure found and ordered by the commission of the alleged errors involved in the consideration of the other specified elements above named. We have somewhat rearranged the order of these as will appear from the subheads specified hereafter, and have reserved the first for a last discussion under this proposition.

### Depreciation Reserve.

The company vigorously attacks the deduction for accrued depreciation. We had occasion to discuss this matter in the case of Carey, Rec., v. Corporation Commission, 168 Okla. 487, 33 P. (2d) 788, wherein we discussed the differences between depreciation reserves set up, actual depreciation, and their relationship. We are presented with the same problem in this matter. The Interstate Commerce Commission has made a study of this question in relation to telephone companies and steam railways. 177 I. C. C. 351. The company had not set up a separate depreciation reserve account for the Tulsa exchange, and it was necessary to study the depreciation reserve account for the state at large and make allocations in order to arrive at the figures which the commission's auditor, Mr. Reed, gave. The company's engineer testified to an estimated depreciation of 5.66 per cent., but this was by the inspection method alone, and probably had more the aspect of loss of functional efficiency or condition per cent. new than depreciation in its true sense. It is needless for us to repeat what we said in this respect in Carey, Rec., v. Corporation Commission, supra. Business practices permit the adoption of the straight line method of calculating the depreciation, and yet in Lindheimer v. Illinois Bell Tel. Co., 292 U. S. 151, 78 L. Ed. 1182, when the experiences of the company indicated that reserves set up on this basis were excessive, the company was ordered to desist and to set up what was known as a "combined maintenance and replacement allowance." It appears to us that probably the straight line method of accruing depreciation, using any reasonable per cent., plus operating replacements, may not truly represent the actual depreciation which has occurred. On the other hand, it is just as probable that the plant new, plus maintenance and replacements, whereby it is kept in a high state of condition, per cent. new and functional efficiency, would not represent the actual loss by depreciation. The depreciation sought is actual depreciation. Depreciation as such comes about from wear, tear, inadequacy, obso-

lescence and changes required by authority of law. There is an illuminating discussion of this element in Lindheimer v. Illinois Bell Tel. Co., supra, wherein it is said:

"In explanation of this large difference (that is, between the reserves for depreciation and depreciation actually experienced) the company urges that the depreciation reserve in a given year does not purport to measure the actual depreciation at that time; that there is no regularity in the development of depreciation; that it does not proceed in accordance with any fixed rule; that as to a very large part of the property there is no way of predicting the extent to which there will be impairment in a particular year. Many different causes operating differently at different times with respect to different sorts of property produce the ultimate loss against which protection is sought. As the accruals to the depreciation reserve are the result of calculations which are designed evenly to distribute the loss over estimated service life, the accounting reserve will ordinarily be in excess of the actual depreciation. Further, there are the special conditions of a growing plant; 'there are new plant groups in operation on which depreciation is accruing, but which are not yet represented, or are but slightly represented, in the retirement losses.' Where, as in this instance, there has been a rapid growth, retirements at one point of time will relate for the most part to the smaller preceding plant, while the depreciation reserve account is currently building up to meet the 'increased eventual retirement liability' of the enlarged plant.

"Giving full weight to these considerations, we are not persuaded that they are adequate to explain the great disparity which the evidence reveals. As the company's counsel say: 'The reserve balance and the actual depreciation at any time can be compared only after examining the property to ascertain its condition; the depreciation, physical and functional, thus found can be measured in dollars and the amount compared with the reserve.' Here, we are dealing not simply with a particular year, but with a period of many years —a fairly long range of experience—and with careful and detailed examination made both at the beginning and near the end of that period. The showing of the condition of the property, and of the way in which it has been maintained, puts the matter in a strong light. In substance, the company tells us: The property in Chicago is a modern Bell system plant. Through the process of current maintenance, worn, damaged or otherwise defective parts were being constantly removed before their impairment affected the telephone service. The factors of 'inadequacy' and 'obsolescence' were continuously anticipated by the company, so that the telephone service might not be impaired, 'and no depreciation of that character was ever present in the plant, except to the slight extent that obsolete items of plant were found' as stated by the company's witnesses. One of these witnesses testified that, in his examination of the plant to determine existing depreciation, he understood 'that anything that was obsolete or inadequate was to be depreciated accordingly.' We are told by the company that in that investigation—'Condition new was assumed to be free from defects or impairment of any kind, that is, perfect or 100% condition, and the thing as it stood in actual use in the plant was compared with the same thing new.' 'All existing depreciation, both physical and functional, was reduced to a percentage, and subtracted from 100 per cent.' The service measured up to the standards of the telephone art at all times. The plant capable of giving such service 'was not functionally deficient, in any practical sense. This is not to say that parts of the plant did not from time to time become inadequate or obsolete, but that the company continuously anticipates and forestalls inadequacy and obsolescence. Before a thing becomes inadequate or obsolete it is removed from the plant.' But little variation was found in the percentage of existing depreciation during the years 1923 to 1931. The company points out that the commission found, in its order of 1923, that the property was then 'in at least 90 per cent. condition.' The weighted total or overall condition, the company shows, 'is 91 per cent. for the years 1923-28 and 92 per cent. for subsequent years.'

"This condition, kept at a nearly constant level, directs attention to the amounts expended for current maintenance. In the process of current maintenance, 'new parts' are 'installed to replace old parts' in units of property not retired. Such 'substitutions' or 'repairs' are separate from the amounts which figure in the depreciation reserve. The distinction between expenses for current maintenance and depreciation is theoretically clear. Depreciation is defined as the expense occasioned by the using up of physical property employed as fixed capital; current maintenance, as the expense occasioned in keeping the physical property in the condition required for continued use during its service life. But it is evident that the distinction is a difficult one to observe in practice with scientific precision, and that outlays for maintenance charged to current expenses may involve many substitutions of new for old parts which tend to keep down the accrued depreciation."

(We omit here tables showing current maintenance and depreciation allowance for several years.)

"These aggregate amounts range from over 30 per cent. to nearly 40 per cent. of the total amounts charged by the company to operating expenses.

"In the light of the evidence as to the expenditures for current maintenance and the proved condition of the property—in the face of the disparity between the actual extent of depreciation, as ascertained according to the comprehensive standards used by the company's witnesses, and the amount of the depreciation reserve — it cannot be said that the company has established that the reserve merely represents the consumption of capital in the service rendered. Rather it appears that the depreciation reserve to a large extent represents provision for capital additions, over and above the amount required to cover capital consumption. This excess in the balance of the reserve account has been built up by excessive annual allowances for depreciation charged to operating expenses."

We believe the facts recited in this quotation disclose the business practices of the company in the case before us. That is to say, it is assumed that a plant new is 100 per cent. condition and 100 per cent. functionally efficient. Constantly, replacements are made in effort to prevent depreciation in either aspect. Experience shows they are signally successful in preventing functional inefficiency. Likewise, condition per cent. new has been maintained at a far higher per cent. figure than a straight line depreciation justified, except as a pure matter of accounting and engineering theory.

The company's engineer, Dinwiddie, testified to a reproduction cost new of $7,859,-541.16, and calculated the depreciation at the time of his inspection (for the purposes of the hearing) by multiplying that figure by 94.34 per cent., which he testified was his estimate of the condition per cent. new of the plant. This gave an estimated depreciation of $344,870.87. If this figure is accepted as truly representative of the depreciation sought, then the efforts of the company to construct a plant at Tulsa piecemeal as the demands of the community required, and to maintain it in a high state of physical condition and functional efficiency have been signally successful.

On the other hand, the company's witness Fritz, whose function with the company "* * * is to make a continuous study of the life history of the plant for the purposes of determining currently necessary depreciation rates for computing the annual expense of depreciation," testified that as a result of his studies of the Tulsa plant, modified by considerations of its rapid growth and the future growth at a less rapid rate, as compared with the experience of the company as a whole, he believed an annual reserve for depreciation of 4.1 per cent. was proper. The evidence is that this annual reserve has been as high as 6 per cent. and 8 per cent. in years past.

This witness testified that there was no logical relation between the condition per cent. new theory used by Dinwiddie in estimating depreciation, and his estimate of the annual needs for depreciation reserve. Obviously, they reach widely separated results. This witness insists that they are not inconsistent. But, as stated in the case of Lindheimer v. Illinois Bell Tel. Co., supra:

"In the light of the evidence as to the expenditures for current maintenance and the proved condition of the property—in the face of the disparity between the actual extent of depreciation, as ascertained according to the comprehensive standards used by the company's witnesses, and the amount of the depreciation reserve—it cannot be said that the company has established that the reserve merely represents the consumption of capital in the service rendered. Rather it appears that the depreciation reserve to a large extent represents provision for capital additions, over and above the amount required to cover capital consumption. This excess in the balance of the reserve account has been built up by excessive annual allowances for depreciation charged to operating expenses."

They may be consistent, as contended by the witness, but they certainly produce results of such disparity as to indicate that neither truly represents actual depreciation.

The commission did not use either of these theories to the exclusion of the other. The first is arrived at by inspection—that is, physical condition by appearance, modified by other factors. The second is arrived at by a close study of the history of the retirement of depreciated items of property entering into the plant's history. The second attempts by studying the past to determine what is necessary to lay aside now to anticipate present and future consumption through service.

As heretofore stated, the company had

not set up a separate reserve for the Tulsa plant. A study of its state-wide reserve resulted in the allocation to the Tulsa plant, on a percentage basis, of a book figure of $1,720,725.81, as a maximum, or $1,290,847.99 as a minimum.

The commission had evidence on the present condition per cent. new of widely varying figures. The company's witness set it at 94.34; the commission's witness set it at 87.3; and calculated upon the book reserve it was 71 per cent. One of the witnesses for the commission was of the opinion that condition per cent. new, by observation, and the depreciation reserve, on a straight line method, should coincide; in other words, that this company having set aside a reserve of 4 per cent. plus for an average plant age of seven years, and thereby recaptured 28 per cent. plus of its capital invested in plant, should have, by observation, a condition per cent. new of 71 per cent. plus. This obviously does not allow for the fact that there might be more or less actual depreciation. On the other hand, the company's witness, by observation, found condition per cent. at 94.34, which obviously overlooks intangible depreciation; and, as stated by other witnesses, observation alone is extremely unreliable.

The commission's witnesses agreed upon $1,421,661.47 as the actual depreciation, and arrived at this by virtue of observation aided by studies of the company's depreciation account. To us this appears to be reasonable, and the company's attack upon it has failed. We do not agree with the company that it constitutes an arbitrary book figure, such as was condemned in West v. C. & P. Tel. Co., 295 U. S. 662, 79 L. Ed. 1640.

The commission found, and we agree, that a 4 per cent. annual reserve on the straight line method accrues depreciation faster than it is actually experienced. But, in the exercise of its discretion, the commission expressly sanctioned the continuance of this annual reserve, and made allowance therefor in calculating the needs of the company.

#### Allowance for Working Capital.

It is conceded by both parties that business experience justifies an allowance to a company beginning business or actually engaging therein of a sum of money adequate to the estimated needs of the business as a working capital. The respective witnesses of the company and commission made estimates in this respect, the company's

estimate being $163,745 and the commission's auditor's estimate being $164,562.52. In treating this item simply as an estimate of business needs, there seems to be a remarkable agreement between these witnesses in their estimates. However, the witness Reed took into consideration the fact that the company billed its customers in advance, as of the first of the month and in the due course of business began to receive such payments, and that the total of such monthly billings in advance was $115,000. His testimony was that it was reasonable to deduct this amount from his estimate above made, because an allowance of working capital is based upon the theory that the company generally must furnish this capital before it actually begins to have receipts for its business sufficient in quantity to meet its needs. However, it was his opinion based upon the operating methods of the company that the public would furnish most of this by advance payments for service. The commission adopted his theory and allowed a working capital of $48,713.75, the difference between his estimate and the estimated monthly collections. We approve this allowance in this figure. The company contends that error has been made in the allowance of $115,000 upon the theory that it is not an allowance for one month, but for three months. This is erroneous. By the company's own figures its collections for three months approximate $347,000. The company likewise says that although it bills its customers in advance, actually all collections are not made at once. Reed allowed for this by taking into consideration a collection period of 45 days. The company admits the receipt of such money in due course, but asserts 45 days for collection has not been allowed. This is no answer to the action of the commission, since the company, by its figures, did not make any allowance in this respect. The allowance, as heretofore stated, is an estimate based upon reasonable business experience and expectation, and the action of the commission will not be condemned because it chooses one estimate rather than another, unless prejudice is shown thereby. The company has not made such a showing in this respect.

The argument is made that the figure allowed is insufficient to meet its banking needs, since the company is required to keep $50,000 in Tulsa and $25,000 in Oklahoma City, in order to obtain banking connections without cost. There is some evidence to support this, but it is not shown

to be reasonable or customary. In addition to this, the figure allowed plus collections must inevitably exceed the Tulsa figure of $50,000, and since the company desires over $160,000 for working capital, where else should it be kept but in banks in Tulsa. The arbitrary figure results in earmarking certain funds, but they are available for business uses in Tulsa. If it actually means an untouchable deposit of $50,000, then such a practice should not be approved without some investigation as to the relative cost for the banking service or the 6 per cent. the public pays on the company's base rate. No strenuous argument is made hereon, and we feel that what we have said disposes of the matter.

### Going Concern Value.

This is an element which the United States Supreme Court has said must be present in every present fair value. Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 59 L. Ed. 1244, and many other cases. This is said upon the theory that a going concern is worth more than one which is completed and ready to "go," but which is not yet "going." McCardle v. Indianapolis Water Co., 272 U. S. 400, 71 L. Ed. 316-326. This statement appears rational. But once made, and accepted, it is probably the most difficult element to arrive at in the whole course of rate making. The Supreme Court of the United States has rejected every single element or group of elements said to compose it. See Los Angeles G. & E. Co. v. Railroad Comm., 289 U. S. 287, 77 L. Ed. 1180. In the case we are considering the company asked for an allowance of $655,891 for "going concern value" composed of the following elements: "Cost of attaching subscribers, $82,863"; "cost of training employees, or building up organization, $61,156, cost of records, $26,273, administration, $17,028, and interest on these items, $4,164." These elements were expressly, or by analogy, disapproved in the case Columbus Gas & Fuel Co. v. Public Utilities Commission, 292 U. S. 398, 78 L. Ed. 1327. It was said in that case that no accounts were kept upon these factors, but on the contrary they were simply estimates, and whatever their amount was they had been taken care of in the operating expenses of the company, which is the condition in this case; "cost of depreciation on idle plant before exchange opens," $258,734. The evidence shows that no such item of expense, or one comparable thereto, was experienced by the company, for the plant at Tulsa began as

a small one suitable to the needs of the community and was increased in size from time to time as the demands of the business demanded or justified. In this case the commission based its value upon the experience of the company, with some modifications, and such a hypothetical charge as this should find no place therein. The same may be said of the next two items consisting of "cost of maintenance and depreciation on idle plant after exchange opens," $89,767, and "interest and taxes on idle plant after exchange opens," $115,906. In connection with these items see Dayton P. & L. Co. v. P. U. Com., 292 U. S. 290, 78 L. Ed. 1267, and Lindheimer v. Illinois Bell Tel. Co., 292 U. S. 151, 78 L. Ed. 1182, and the discussions therein. Finally, the Supreme Court of the United States has said more than once that going concern value is not a perfunctory bookkeeping item which must appear in each rate base. Columbus Gas & Fuel Co. v. P. U. Com., supra, and Los Angeles G. & E. Corporation v. Railroad Commission, supra.

While that court insists upon the allowance of going concern value, and rejects specific elements which the utilities assign as representing this value, yet that court professes to be able to discover the inclusion or omission of such allowance from the base rates examined by it. We must profess to possess the same powers. In our opinion, the presence or absence of this value is determined ultimately by ascertaining whether the present fair value, by whatever formula it is arrived at, is liberal or illiberal in the application of the factors and the sum total allowed.

In our opinion the formula adopted (original cost, less depreciation, plus working capital) is adequate to include this element.

### Reproduction Cost.

Reproduction cost new, less depreciation, is one formula which has been approved for use in finding present fair value. Minnesota Rate Cases, 230 U. S. 352, 57 L. Ed. 1511.

Evidence from several witnesses upon this formula was received by the commission, but actually in arriving at the present fair value in this case this particular formula was not used.

The company's witness used the present day prices in determining reproduction cost new. It was conclusively shown that prices for these materials had remained stationary over a period of several years prior to 1933, and in December, 1933, had suddenly taken

254

an upward trend of 20 per cent. to 30 per cent. It was these abnormal prices which were used by the company's witness. The unfairness of such prices as tests for present fair value in rate making was spoken of in the case of West v. C. & P. Tel. Co., supra, as follows:

"While, therefore, the owner of such a property must assume and may not pass on to the public the risk involved in a general decline in values, and may have the advantage also of a general rise in such values, it would not only be unfair but impracticable to adjust the value and the consequent rate of return to sudden fluctuations in the price level. For in its essence this is the sort of aggregate whose value is not fairly or accurately reflected by such abrupt alterations in the market. A public service corporation ought not, therefore, in a rate proceeding, to be permitted to claim to the last dollar an increased value consequent upon a sudden and precipitate rise in spot prices of material or labor. No more ought the value attributable to its property be depressed by a similar sudden decline in the price level. The present case affords an excellent example."

The commission's witness took spot prices for his estimate of the reproduction cost new; but he attempted to modify them by considerations, such as lack of competition, the affiliation between seller and buyer, and his opinion as to what was proper.

The commission must have been aware of the difficulties attendant upon applying this formula, and although it received evidence which could have been used in calculating present fair value thereon, it actually chose another formula. Errors of the witnesses in respect of their calculations on this formula thereby became immaterial.

Western Electric Prices.

The company is a part of an integrated business composed of various affiliates, all of which in the final-reckoning are under one control. The company purchases all of its equipment from Western Electric Company. The business of manufacturing and selling telephone equipment is not a monopoly in the exact sense of that word. But in practice it so results in so far as the company is concerned. The record is clear to the effect that the price level of this equipment remained the same during the depression as it was in predepression days, and actually in December, 1933, these prices actually advanced 20 per cent. or more. It is too well known for argument that prices generally suffered a decline in 1930, 1931, and 1932, and it was only by the dint of government

urging and spending and legislation that any upward trend was brought about. It cannot be said that an increase of prices by the Western Electric was out of line with trends generally, but, on the other hand, nothing short of a practical monopoly could keep prices up while over a period of three years or more when business generally was unstable and far below normal. If the Western Electric were an independent company, with some free competition, and the company was free to seek its own market and buy or refrain from buying as it chose, these considerations might have controlling effect. But when a legislative body takes into hand a rate-making proceeding it must not be blinded to realities.

Dinwiddie, a witness for the company, used the Western Electric prices (as increased in 1933) "assuming the existing affiliation," and reached a present fair value of $7,887,794, without any allowance for depreciation. The commission declined to follow his results; and this is one alleged error on this subject. There were three valuations given in evidence. Dinwiddie's value is $1,939,093.44 higher than Reed's value, based upon original cost, less depreciation, plus working capital, and is $2,239,496.54 higher than Richardson's value based upon reproduction cost new, less depreciation. Dinwiddie and Richardson purported to use Western Electric prices and an agreed inventory in arriving at reproduction cost new. The discrepancy of more than $2,000,000 in their figures, deducting $655,891 going concern value allowed by Dinwiddie, but not allowed by the commission engineer, arises by virtue of certain omissions by Richardson and of differences in other factors. Actually while the commission order expresses doubt as to the fairness of Western Electric prices, they were the ones actually used.

The figure of present fair value actually found lies between these figures. Therefore, there was no refusal to receive them in evidence (that is, estimates of their effect) and the question of their fairness considering the affiliation between buyer and seller did not require an investigation.

Value.

The attack upon the rate base actually found is somewhat general, the bulk of the argument going to the attacks upon specific elements considered therewith all of which we have heretofore discussed and disposed of. No precise formula is more acceptable than any other. Pioneer Tel. & Tel. Co. v.

Westenhaver, 29 Okla. 429, 118 P. 354; Carey, Rec., v. Corporation Commission, supra; Los Angeles G. & E. Corp. v. Railroad Comm., supra.

In its final aspect a rate base of present fair value is a judgment figure—an estimate or opinion, based upon the record. Minn. Rate Cases, supra, and Pioneer Tel. & Tel. Co. v. Westenhaver, supra.

The original cost (Smyth v. Ames, 169 U. S. 466, 42 L. Ed. 819, and Los Angeles G. & E. Corp. v. Ry. Comm., supra), reproduction cost new, less depreciation (Mo. ex rel. S. W. Bell Tel. Co. v. P. S. Comm., 262 U. S. 276, 67 L. Ed. 981) historical cost, modified by additions and deductions (Dayton P. & L. Co. v. P. U. Comm., 292 U. S. 290, 78 L. Ed. 1267), and total investment, less a depreciation calculated upon scientific basis (Lindheimer v. S. W. Bell Tel. Co., supra), have all been approved as satisfactory formulas. They all have their proper application singly, and undoubtedly evidence on more than one may be received and considered.

The commission deemed the original cost, less depreciation, plus working capital, the proper formula herein. The cost was established by the records of the company at $7,668,161.57. The depreciation was found to be $1,421,662.47 and has been approved. This was deducted, and to the difference was added working capital, heretofore approved. This resulted in a figure of $6,295,212.85, which was rounded out at $6,300,000.

The witnesses who testified to reproduction cost new, less depreciation, varied so widely in their estimates that there appeared no way to reconcile them. The company's witness based his estimate upon cost prices which never had suffered in the depression, but which took an upward trend along with other prices which had suffered material reductions. A substantial part of the plant had been constructed when prices were at a high level over a period of years. In other words, the cost of $7,668,161.57 represented what might be termed a top price cost.

It was the actual experience of the company. The estimate of the commission's engineer, Richardson, was several hundred thousand dollars less than the figure of $6,300,000 and more than $2,000,000 less than that of the company's witness. The figure actually adopted, upon the record, appears to us to be fair and reasonable.

"Rates which fail to yield a fair return at the time of the inquiry cannot be justified upon the basis of the average revenues realized in the past."

The above caption is a statement of the company's proposition 1, but is one which we have reserved for discussion until we had examined the other assignments, and especially II. The company has attacked two calculations involved in the discussion of this proposition, viz., estimate of future revenues and income taxes. It has appeared to us that neither of these calculations could be examined without first understanding the base rate to which they were applied.

The company insists that the last year's experience showed that its gross revenues were far below those of previous years, which likewise resulted in lower net revenues from which the return could be taken after all other fixed charges, including income taxes, had been paid. The commission did not base its estimates upon the last available year's results, but rather took as a basis the average for the past six years. The company insists that it is fundamental error to estimate future earnings upon past records. P. U. Comm. v. N. Y. Tel. Co., 271 U. S. 23, 70 L. Ed. 808, and West Ohio Gas Co. v. P. U. C. of Ohio, 294 U. S. 79, 79 L. Ed. 773.

Those cases, and especially the last one, are authority for the rule that a rate-making body cannot ignore the signals of trends downward and make a guess that future trends will not be downward. In other words, when the last year's business, as well as all other indications (and the courts take judicial notice of business conditions. especially economic depressions, A., T. & S. F. Ry. v. U. S., 284 U. S. 248, 76 L. Ed. 273), indicate a disruption of business conditions and a general lowering of business returns, such must be taken into consideration.

But the converse of this particular application is true. It is not proper to call attention to the last year's business returns, which may be low, and in the face of improving conditions generally, to insist that the lower trends must prevail.

The past experience of a company, which involves its plant structure, the portion thereof being used at the particular time, the trends of business conditions generally indicating that more of the plant will become idle or that idle portions of the plant will be soon called into activity, the revenues which were obtained by full operation

as contrasted with the revenues obtained as less and less of the plant was used, and the relative percentage of revenues devoted to operating expenses and fixed charges, are all useful in forming a "prediction for the future."

The commission embodied in its order several calculations based upon an annual return calculated upon the past six years, three of which were peak predepression years and three of which were depression years, manifesting their full effect upon this company's business, and demonstrated that a 6 per cent. return, which all agreed was reasonable and proper, was available on the base and return, with a surplus ranging from $56,000 to $117,000. We have examined these in the light of the record, and they appear reasonable to us.

The company merely insists that upon the same figures it is shown its return will be 5.50 per cent. It does not set out its calculation and we are unable to verify it.

Since the company's business for the first few months of 1934 showed a decided upward trend, and this court takes judicial notice that business has increased along all lines since, we are forced to say that the company has not sustained the burden upon it in this instance to show confiscation. One-half of one per cent. in our opinion, allowing the variety of theories involved, is too close a margin to support a charge of confiscation. Since a rate is an intelligent estimate, or prediction of what the future will be, we think that is close enough.

On the question of income tax, it appears that the parties are in hopeless conflict as to the approximate amount due. The figures of the commission's order appear reasonable, and the company has wholly failed to point out wherein they are erroneous; we approve that figure.

By the express command of our Constitution, art. 9, sec. 22 (sec. 13607, O. S. 1931), " * * * The action of the commission appealed from shall be regarded as prima facie just, reasonable, and correct." Kansas City, M. & O. Ry. Co. v. State, 25 Okla. 715, 107 P. 912.

The Supreme Court of the United States has said many times that a public utility company seeking to establish that a rate order results in confiscation, has the burden of establishing the alleged confiscatory nature of the rate order with clarity and definiteness. Lindheimer v. Illinois Bell Tel. Co., supra.

After a careful consideration of the order appealed from, in the light of the record before us, and in the face of the particular attacks made upon the methods adopted and the final results, we are of the opinion that the company has not rebutted the presumption inhering in the order, nor has it sustained the burden of pointing out with clarity and definiteness the asserted confiscation.

The order of the Corporation Commission is affirmed.

RILEY, BUSBY, WELCH, CORN, and HURST, JJ., concur. OSBORN, C. J., and GIBSON, J., dissent to syllabus No. 1. PHELPS, J., absent.