211 U.S. 210 (1908)
PRENTIS et al., CONSTITUTING THE STATE CORPORATION COMMISSION OF VIRGINIA,
v.
ATLANTIC COAST LINE COMPANY.
SAME
v.
CHESAPEAKE AND OHIO RAILWAY COMPANY.
SAME
v.
CHESAPEAKE WESTERN RAILWAY.
SAME
v.
LOUISVILLE AND NASHVILLE RAILROAD COMPANY.
SAME
v.
NORFOLK AND WESTERN RAILWAY COMPANY.
SAME
v.
SOUTHERN RAILWAY COMPANY.
Nos. 270, 271, 272, 273, 274, 275.
Supreme Court of United States.
Argued October 16, 19, 20, 1908.
Decided November 30, 1908.
APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.
*211 Mr. William A. Anderson, Attorney General of the State of Virginia, Mr. John W. Daniel and Mr. A. Caperton Braxton, for appellants.
Mr. Alfred P. Thom, for appellees, with whom Messrs. Alexander Hamilton, William B. McIlwaine, Henry T. Wickham, Henry Taylor, Jr., S.S.P. Patteson, Geo. H. Taylor, H.L. Stone, Jos. I. Doran, Lucian H. Cocke and John K. Graves were on the briefs. Mr. Henry L. Stone filed a separate brief for Louisville & Nashville Railroad Company on the arbitrary classification by the State Corporation Commission of Virginia in fixing the rates complained of.
*223 MR. JUSTICE HOLMES delivered the opinion of the court.
These are bills in equity brought in the Circuit Court to enjoin the members and clerk of the Virginia State Corporation Commission from publishing or taking any other steps to enforce a certain order fixing passenger rates. The bills allege, with some elaboration of the facts, that the rates in question are confiscatory, and other matters not necessary to mention, and set up the Fourteenth Amendment, etc. The defendants appeared specially, and by demurrer and plea respectively put forward that the proceedings before the commission are proceedings in a court of the State, which the courts of the United States are forbidden to enjoin, Rev. Stats. § 720, and that the decision of the commission makes the legality of the rates res judicata. On these pleadings final decrees were entered for the plaintiffs, and the defendants appealed to this court. Therefore, as the case is presented, it is to be assumed that the order confiscates the plaintiffs' property and infringes the Fourteenth Amendment if the matter is open to inquiry. The question principally argued, and the main question to be discussed, is whether the order is one which, in spite of its constitutional invalidity, the courts of the United States are not at liberty to impugn.
*224 The State Corporation Commission is established and its powers are defined at length by the constitution of the State. There is no need to rehearse the provisions that give it dignity and importance or that add judicial to its other functions, because we shall assume that for some purposes it is a court within the meaning of Rev. Stats. § 720, and in the commonly accepted sense of that word. Among its duties it exercises the authority of the State to supervise, regulate and control public service corporations, and to that end, as is said by the Supreme Court of Virginia and repeated by counsel at the bar, it has been clothed with legislative, judicial and executive powers. Norfolk & Portsmouth Belt Line R.R. Co. v. Commonwealth, 103 Virginia, 289, 294.
The state constitution provides that the commission, in the performance of the duty just mentioned, shall from time to time prescribe and enforce such rates, charges, classification of traffic, and rules and regulations, for transportation and transmission companies doing business in the State, and shall require them to establish and maintain all such public service, facilities and conveniences, as may be reasonable and just. Before prescribing or fixing any rate or charge, etc., it is to give notice (in case of a general order not directed against any specific company by name, by four weeks' publication in a newspaper) of the substance of the contemplated action and of a time and place when the commission will hear objections and evidence against it. If an order is passed, the order again is to be published as above before it shall go into effect. An appeal to the Supreme Court of Appeals is given of right to any party aggrieved, upon conditions not necessary to be stated, and that court, if it reverses what has been done, is to substitute such order as in its opinion the commission should have made. The commission is to certify the facts upon which its action was based and such evidence as may be required, but no new evidence is to be received, and how far the findings of the commission can be revised perhaps is not quite plain. No other court of the State can review, reverse, correct or annul *225 the action of the commission, and in collateral proceedings the validity of the rates established by it cannot be called in doubt.
When a rate has been fixed, the commission has power to enforce compliance with its order by adjudging and enforcing, by its own appropriate process, against the offending company the fines and penalties established by law. But a hearing is required, and the validity and reasonableness of the order may be attacked again in this proceeding, and all defenses seem to be open to the party charged with a breach.
On July 31, 1906, under the provisions outlined, the commission published in a newspaper notice to the several steam railroad companies doing business in Virginia, and all persons interested, that at a certain time and place it would hear objections to an order prescribing a maximum rate of two cents a mile for the transportation of passengers, with details not needing to be stated. A hearing was had, and the complaints (appellees) severally appeared and urged objections similar to those set up in the bills. On April 27, 1907, the commission passed an order prescribing the rates, but in more specific form. For certain railroads named, including all of the complainants except as we shall state, the rate was to be two cents; for certain excepted branches of the Southern Railway Company, two and half; for others, including the Chesapeake Western Railway, three; and for others three and a half cents a mile, with a minimum charge of ten cents. Publication of the order was directed, and at that stage these bills were brought.
In order to decide the cases it is not necessary to discuss all the questions that were raised or touched upon in argument, and some we shall lay on one side. We shall assume that when, as here, a state constitution sees fit to unite legislative and judicial powers in a single hand, there is nothing to hinder so far as the Constitution of the United States is concerned. Dreyer v. Illinois, 187 U.S. 71, 83, 84; Winchester & Strasburg R.R. Co. v. Commonwealth, 106 Virginia, 264, 268. We shall assume, as we have said, that some of the powers of the commission *226 are judicial, and we shall assume, without deciding, that, if it was proceeding against the appellees to enforce this order and to punish them for a breach, it then would be sitting as a court and would be protected from interference on the part of courts of the United States.
But we think it equally plain that the proceedings drawn in question here are legislative in their nature, and none the less so that they have taken place with a body which at another moment, or in its principal or dominant aspect, is a court such as is meant by § 720. A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative not judicial in kind, as seems to be fully recognized by the Supreme Court of Appeals, Commonwealth v. Atlantic Coast Line Ry. Co., 106 Virginia, 61, 64, and especially by its learned President in his pointed remarks in Winchester and Strasburg R.R. Co. and others v. Commonwealth, 106 Virginia, 264, 281. See further Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 167 U.S. 479, 499, 500, 505; San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 440.
Proceedings legislative in nature are not proceedings in a court within the meaning of Rev. Stats. § 720, no matter what may be the general or dominant character of the body in which they may take place. Southern Ry. Co. v. Greensboro Ice & Coal Co., 134 Fed. Rep. 82, 94, affirmed sub nom. McNeill v. Southern Ry. Co., 202 U.S. 543. That question depends not upon the character of the body but upon the character of the proceedings. Ex parte Virginia, 100 U.S. 339, 348. They are not a suit in which a writ of error would lie under Rev. Stats. § 709, and Act of February 18, 1875, c. 80, 18 Stat. 318. See Upshur County v. Rich, 135 U.S. 467; Wallace v. Adams, 204 *227 U.S. 415, 423. The decision upon them cannot be res judicata when a suit is brought. See Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362. And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up. A judge sitting with a jury is not competent to decide issues of fact; but matters of fact that are merely premises to a rule of law he may decide. He may find out for himself, in whatever way seems best, whether a supposed statute ever really was passed. In Pickering v. Barkley, Style, 132, merchants were asked by the court to state their understanding as an aid to the decision of a demurrer. The nature of the final act determines the nature of the previous inquiry. As the judge is bound to declare the law he must know or discover the facts that establish the law. So when the final act is legislative the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case. If a state constitution should provide for a hearing before any law should be passed, and should declare that it should be a judicial proceeding in rem and the decision binding upon all the world, it hardly is to be supposed that the simple device could make the constitutionality of the law res judicata, if it subsequently should be drawn in question before a court of the United States. And all that we have said would be equally true if an appeal had been taken to the Supreme Court of Appeals and it had confirmed the rate. Its action in doing so would not have been judicial, although the questions debated by it might have been the same that might come before it as a court, and would have been discussed and passed upon by it in the same way that it would deal with them if they arose afterwards in a case properly so called. We gather that these are the views of the Supreme Court of Appeals itself. Atlantic Coast Line Ry. Co. v. Commonwealth, 102 Virginia, 599, 621. They are implied *228 in many cases in this and other United States courts in which the enforcement of rates has been enjoined, notwithstanding notice and hearing, and what counsel in this case call litigation in advance. Legislation cannot bolster itself up in that way. Litigation cannot arise until the moment of legislation is past. See Southern Ry. Co. v. Commonwealth, 107 Virginia, 771, 772.
It appears to us that the most plausible objection to these bills is not the one most dwelt upon in argument, but that they were brought too soon. Our doubt is a narrow one and its limits should be understood. It seems to us clear that the appellees were not bound to wait for proceedings brought to enforce the rate and to punish them for departing from it. Those, we have assumed in favor of the appellants would be proceedings in court and could not be enjoined; while to confine the railroads to them for the assertion of their rights would be to deprive them of a part of those rights. If the railroads were required to take no active steps until they could bring a writ of error from this court to the Supreme Court of Appeals after a final judgment, they would come here with the facts already found against them. But the determination as to their rights turns almost wholly upon the facts to be found. Whether their property was taken unconstitutionally depends upon the valuation of the property, the income to be derived from the proposed rate and the proportion between the two  pure matters of fact. When those are settled the law is tolerably plain. All their constitutional rights, we repeat, depend upon what the facts are found to be. They are not to be forbidden to try those facts before a court of their own choosing if otherwise competent. "A State cannot tie up a citizen of another State, having property within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts." Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362, 391; Smyth v. Ames, 169 U.S. 466, 517. See McNeill v. Southern Railway Co., 202 U.S. 543; Ex parte Young, 209 U.S. 123, 165. Other cases further illustrating *229 this point are Chicago & N.W. Ry. Co. v. Dey, 35 Fed. Rep. 866; Northern Pacific Ry. Co. v. Keyes, 91 Fed. Rep. 47; Western Union Telegraph Co. v. Myatt, 98 Fed. Rep. 335.
Our hesitation has been on the narrower question whether the railroads, before they resorted to the Circuit Court, should not have taken the appeal allowed to them by the Virginia constitution at the legislative stage, so as to make it absolutely certain that the officials of the State would try to establish and enforce an unconstitutional rule. Considerations of comity and convenience have led this court ordinarily to decline to interfere by habeas corpus where the petitioner had open to him a writ of error to a higher court of a State, in cases where there was no merely logical reason for refusing the writ. The question is whether somewhat similar considerations ought not to have some weight here.
We admit at once that they have not the same weight in this case. The question to be decided, we repeat, is legislative, whether a certain rule shall be made. Although the appeal is given as a right, it is not a remedy, properly so called. At that time no case exists. We should hesitate to say, as a general rule, that a right to resort to the courts could be made always to depend upon keeping a previous watch upon the bodies that make laws, and using every effort and all the machinery available to prevent unconstitutional laws from being passed. It might be said that a citizen has a right to assume that the constitution will be respected, and that the very meaning of our system in giving the last word upon constitutional questions to the courts is that he may rest upon that assumption and is not bound to be continually on the alert against covert or open attacks upon his rights in bodies that cannot finally take them away. It is a novel ground for denying a man a resort to the courts that he has not used due diligence to prevent a law from being passed.
But this case hardly can be disposed of on purely general principles. The question that we are considering may be termed a question of equitable fitness or propriety, and must *230 be answered on the particular facts. The establishment of railroad rates is not like a law that affects private persons who may never have heard of it till it was passed. It is a matter of great interest, both to the railroads and to the public, and is watched by both with scrutinizing care. The railroads went into evidence before the commission. They very well might have taken the matter before the Supreme Court of Appeals. No new evidence and no great additional expense would have been involved.
The State of Virginia has endeavored to impose the highest safeguards possible upon the exercise of the great power given to the State Corporation Commission, not only by the character of the members of that commission, but by making its decisions dependent upon the assent of the same historic body that is entrusted with the preservation of the most valued constitutional rights, if the railroads see fit to appeal. It seems to us only a just recognition of the solicitude with which their rights have been guarded, that they should make sure that the State in its final legislative action would not respect what they think their rights to be, before resorting to the courts of the United States.
If the rate should be affirmed by the Supreme Court of Appeals and the railroads still should regard it as confiscatory, it will be understood from what we have said that they will be at liberty then to renew their application to the Circuit Court, without fear of being met by a plea of res judicata. It will not be necessary to wait for a prosecution by the commission. We may add that when the rate is fixed a bill against the commission to restrain the members from enforcing it will not be bad as an attempt to enjoin legislation or as a suit against a State, and will be the proper form of remedy. Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362; Smyth v. Ames, 169 U.S. 466; Chicago, Milwaukee & St. Paul Ry. Co. v. Tompkins, 176 U.S. 167; Hanley v. Kansas City Southern Ry. Co., 187 U.S. 617; McNeill v. Southern Ry. Co., 202 U.S. 543; Mississippi Railroad Commission v. Illinois *231 Central Ry. Co., 203 U.S. 335; Ex parte Young, 209 U.S. 123.
It is proper before closing to mention one decision that was relied upon by the appellees, and one or two other matters peculiar to the cases before the court. In McNeill v. Southern Ry. Co., 202 U.S. 543, the same moment was selected for bringing suit as in these cases, while an examination of the laws of North Carolina discloses that there were statutory provisions for appeal somewhat similar to those in the Virginia constitution, to which we now are referring. But, apart from other differences, in that case the ground of the decree was that the state commission was dealing with a subject-matter beyond its power; no regulation would have been valid, 202 U.S. 561, and the considerations to which we now are giving weight naturally were not urged. But this decision suggests that in three of the present cases an equally potent constitutional bar is alleged against the proceedings of the commission. The Chesapeake and Ohio, the Norfolk and Western and the Southern Railway Companies all set up general laws, alleged to be incorporated in their charters and to constitute contracts, providing that their tolls should not be diminished except under conditions of fact alleged not to exist.
If the State has bound itself by contract not to cut down the rates as contemplated, there would seem to be no reason why the suit should not be entertained now. See Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362, 393. But it would be premature and is unnecessary to decide whether the State has done so or not. No rate is irrevocably fixed by the State until the matter has been laid before the body having the last word. It may be that that body will adhere to the old rate or will establish one that will not be open to the charge of violating the contracts alleged. The contracts alleged do not prohibit a certain reduction if the profits heretofore realized have exceeded a certain amount. On the question of contract as on that of confiscation it is reasonable and proper *232 that the evidence should be laid, in the first instance, before the body having the last legislative word.
There is yet another difficulty in applying to these cases the comity which it is desirable if possible to apply. The Virginia statute of April 15, 1903, enacted to carry into effect the provision of the constitution, requires, by § 34, certain, if not all, appeals to be taken and perfected within six months from the date of the order. 1 Pollard's Code of Virginia, c. 56a, 714. It may be that when an appeal is taken to the Supreme Court of Appeals this section will be held to apply and the appeal be declared too late. We express no opinion upon the matter, which is for the state tribunals to decide, but simply notice a possibility. If the present bills should be dismissed, and then that possible conclusion reached, injustice might be done. As our decision does not go upon a denial of power to entertain the bills at the present stage but upon our views as to what is the most proper and orderly course in cases of this sort when practicable, it seems to us that the bills should be retained for the present to await the result of the appeals if the companies see fit to take them. If the appeals are dismissed as brought too late the companies will be entitled to decrees. If they are entertained and the orders of the commission affirmed, the bills may be dismissed without prejudice and filed again.
Decrees reversed.
MR. JUSTICE BREWER is of the opinion that the decrees should be affirmed.
MR. CHIEF JUSTICE FULLER, concurring in reversing the decrees, dissents from the opinion.
I preface what I have to say with a sketch of the record in these cases, abbreviated from the brief of counsel.
The Virginia State Corporation Commission was created and its functions, powers, duties and the essentials of its procedure *233 were prescribed in detail by the constitution of the State as well as by statute. It was made primarily a judicial court of record of limited jurisdiction, possessing also certain special legislative and executive powers. When it proposed to make a change in a rate of a public service corporation, or otherwise to prescribe a new regulation therefor, the commission was required, sitting as a court, to issue its process, in the nature of a rule, against the corporation concerned, requiring it to appear before the commission at a certain time and place and show cause, if any it could, why the proposed rate should not be prescribed. The judicial question involved on the return to such rule was whether or not the contemplated rate was confiscatory, or otherwise unjust or unreasonable, and in the hearing and disposition of this question the proceedings of the commission as prescribed by law were in every respect the same as those of any other judicial court of record. It issued, executed and enforced its own writs and processes; it could issue and enforce writs of mandamus and injunction; it punished for contempt, and kept a complete record and docket of its proceedings; it summoned witnesses and compelled their attendance, and the production of documents; it ruled upon the admissibility of evidence; it certified any exception to its rulings; and its judgments, decrees and orders had the same force and effect as those of any other court of record in the State, and were enforced by its own proper processes. It was not subject to restraint by any other state court, and from any and every ruling or decision by it an appeal lay to the Supreme Court of Appeals of the State, and was heard upon the record made for and certified by the commission, exactly as in the case of appeals from any other court; and pending the decision of such appeal the order appealed from might by a supersedeas be suspended in its operation.
Not only do the constitution and laws of Virginia make the commission a judicial court of record by clothing it with all the attributes of such a tribunal, but they expressly declare it a court, and require it to proceed only by due process of law *234 and inquire into and determine every judicial question coming before it. It has repeatedly held itself to be a court and subject to all the obligations thereof, and the Supreme Court of Appeals, the highest state judicial tribunal, has formally and expressly so held.
When this court shall have in the manner above indicated fully heard all parties interested, and, proceeding by due process of law as to them, has judicially determined that the proposed rate or regulation is not confiscatory, nor otherwise unjust or unreasonable, then, but not until then, it is authorized by the constitution and laws of Virginia to enter an order prescribing such rate or regulation, from which order an appeal lies to the Supreme Court of Appeals, with, as has been said, the right of suspension by supersedeas pending the appeal. Assuming that the prescribing of the rate after it has been judicially determined to be reasonable is necessarily a legislative act, then the constitution of the State expressly confers upon this commission the legislative power of prescribing a rate after it has judicially ascertained and decided it to be not below the limit of "reasonable."
On July 31, 1906, the State Corporation Commission issued and caused to be served a notice to the "steam railroad companies doing business in Virginia and all persons interested," that, at 12 o'clock noon, on November 1, 1906, at Richmond, the commission would "hear and consider any objections which may be urged against a rule, regulation, order or requirement of the commission fixing and prescribing a maximum rate of charge of two cents per mile for the transportation of passengers over the line of any railroad company in this State, operated by steam, between points within the State of Virginia."
Accordingly, on November 1, 1906, the appellee companies appeared before the commission, and filed their answers in writing, setting forth why, in their opinion, the proposed two cent rate would be less than reasonable.
The commission thereupon entered into a most thorough *235 hearing of this question of the reasonableness of the proposed rate, in which hearing the appellee companies were represented by counsel and introduced elaborate evidence.
No evidence was taken or considered, save publicly, in the open sessions of the commission, when appellees were given the fullest opportunity (of which they availed themselves) to be present, to introduce their own testimony, by witnesses and documents, to cross-examine opposing witnesses, to object to the introduction of witnesses or documents, and to except of record to any ruling whatever of the commission.
No evidence was rejected which any railroad company offered. The hearing was continued for several months, and the case was not closed until the companies involved had formally announced, in open court, that they had nothing more to offer.
On April 27, 1907, practically six months after the hearing began, the commission entered its order (which is the basis of appellees' complaint in this cause), accompanied with an elaborate written opinion, giving the grounds therefor.
By this order certain passenger rates  in no case less than two cents per mile  were prescribed for the defendant railroad companies, to go into effect on July 1, 1907, the commission being of opinion, and so deciding, that the rates therein fixed were not confiscatory nor otherwise unjust or unreasonable to said companies.
The appellee companies refused either to obey the order of the commission, or to appeal therefrom, and publication of the order was directed, but before it had been accomplished, and on May 15, 1907, appellees filed bills in the Circuit Court of the United States for the Eastern District of Virginia, to enjoin the commission from enforcing its order of April 27, 1907, or taking any other steps therein, and a restraining order was entered enjoining the members of the commission and their clerk from further proceeding in the matter until a motion for an injunction pendente lite could be heard, and requiring them to appear before the Circuit Judge in Asheville, North Carolina, *236 on June 27, 1907, to show cause why such injunction should not be granted. Appellants entered a special and limited appearance, and filed their joint and separate answers to the rule, in which they denied the jurisdiction of the court.
The cause having been heard on the rule and answers thereto, the Circuit Judge on July 10, 1907, overruled the objection to the court's jurisdiction, and granted injunctions pendente lite, as prayed for. Thereupon the defendant, Prentis, filed his demurrer, based on substantially the same grounds as those assigned in the answer to the rule, and the three other defendants filed their joint and separate plea, setting up specifically that the commission is a court within the purview of § 720 of the United States Revised Statutes, and on September 10, 1907, by leave of court, all four of the defendants filed their joint and separate plea of res judicata.
December 26, 1907, the court overruled the demurrer and both pleas, and the defendants declining to answer further, a final decree was on that day entered in each case taking the bills pro confesso, and perpetuating the injunctions, with costs. Thereupon appeals were allowed and prosecuted from said final decrees.
In my opinion, a preliminary objection is fatal to the maintenance of these bills. It appears on their face that the appellees did not avail themselves of the right of appeal to the Court of Appeals of Virginia, which was absolutely vested in them by the constitution and laws of that Commonwealth. Such an appeal would have brought up the question of the alleged unreasonableness of the designated rate, and appellees cannot assume that the decision of the commission would necessarily have been affirmed. If reversed or changed to meet appellees' views, the whole ground of equity interposition would disappear. In such circumstances it is the settled rule that courts of equity will not interfere. The transaction must be complete, and jurisdiction cannot be rested on hypothesis. A fortiori, this must be so where Federal courts are asked to interfere with the legislative, executive or judicial acts of a State, unless *237 some exceptional and imperative necessity is shown to exist, which cannot be asserted here.
Moreover, this is demanded by comity, and what comity requires is as much required in courts of justice as in anything else.
"`Comity,'" said Mr. Justice Gray in the leading case of Hilton v. Guyot, 159 U.S. 113, 163, "in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."
And as applied to Federal interference with state acts, the observance of this rule of comity should be regarded as an obligation. It is recognized as such by § 720 of the Revised Statutes.
By the constitution of Virginia the commission is vested with legislative as well as judicial powers, and the validity of that union of powers has been repeatedly upheld by the highest judicial tribunal of that Commonwealth  the matter being committed to the determination of the State. It seems equally true, that whether an adjudication by the commission, on notice and hearing, that proposed rates are reasonable and not confiscatory, may lawfully be had prior to the legislative act of imposing the rates is also a matter for state determination, and at all events that question should, in the first instance, be decided on appeal by the Court of Appeals. I cannot see why the reasonableness and justness of a rate may not be judicially inquired into and judicially determined at the time of the fixing of the rate, as well as afterwards, but that and kindred questions should be tested as provided by this constitution and these laws before the controversy is precipitated into a Circuit Court of the United States. Power grows by what it feeds on, and to hold that state railroad companies can *238 take their chances for the fixing of rates in accordance with their views in a tribunal provided for that purpose by state constitutions and laws, and then, if dissatisfied with the result, decline to seek a review in the highest court of the State, though possessed of the absolute right to do so, and invoke the power of the Federal courts to put a stop to such proceedings, is, in my opinion, utterly inadmissible and of palpably dangerous tendency.
MR. JUSTICE HARLAN, also concurring in the reversal of the decree, but dissenting from the opinion of the court.
I concur in the general observations of the Chief Justice, and with him dissent from the opinion of the court. But I go somewhat further than he has done. I hold that the Circuit Court was entirely without authority, by injunction, to stay the proceedings of the State Corporation Commission. By § 720 of the Revised Statutes it is provided that "the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law authorizing proceedings in bankruptcy." Such has been the law since 1793. In my judgment, the Virginia State Corporation Commission is, in every substantial sense, a court. It is conclusively shown to be such by the provisions of the constitution and laws of Virginia, as interpreted by the highest court of Virginia and as summarized in the opinion of the Chief Justice. If the commission is a court, within the meaning of § 720, then the Circuit Court of the United States was wholly without authority to stay the proceedings of that tribunal by the writ of injunction. The Circuit Court could not grant the writ of injunction in face of the act of Congress expressly forbidding such action. No one will question the authority of Congress to prescribe the limits of the jurisdiction of the courts created by it.
It is suggested that under this view there is danger that rights granted or secured by the Constitution may be violated *239 by the judgment of the commission or by the judgment of the Court of Appeals of Virginia. A conclusive answer to this suggestion is that if the final action of the commission, in any case of rate-making, amounts to confiscation of the property of the corporation whose rates are regulated, and therefore is to be held wanting in due process of law as taking private property for public use without just compensation, and if such action be sustained by the highest court of Virginia, then the way is plainly open to bring that question to this court upon writ of error. Rev. Stat. § 709. In this way any Federal right, specially set up and denied by the state tribunals, can be adequately protected by the final judgment of this court.
In my opinion, the decree should be reversed, with direction to dismiss the original suit brought in the Federal court.