OKLAHOMA CITY-ADA-ATOKA RY. CO. et al. v. STATE et al.

No. 34724. Jan. 15, 1952.

Rehearing Denied May 6, 1952.

Appeal Dismissed Oct. 27, 1952.

See 72 S. Ct. 104.

248 P. 2d 1005.

E. G. Nahler and A. J. Baumann, St. Louis, Mo., and G. W. Satterfield, Ben Franklin, and H. L. Harman, Oklahoma City, for plaintiff in error St. Louis-San Francisco Railway Company (J. M. Kurn and Frank A. Thompson, Trustees).

James D. Gibson, Muskogee, for plaintiff in error Oklahoma City-Ada-Atoka Railway Company.

W. T. Anglin, Holdenville, and Jarman & Jarman, Oklahoma City, for defendant in error Oklahoma Portland Cement Company.

Mac Q. Williamson, Atty. Gen., for defendant in error State of Oklahoma, Corporation Commission.

BINGAMAN, J. The defendant in error, Oklahoma Portland Cement Company, as complainant, recovered a judgment before the Oklahoma Corporation Commission against the plaintiffs in error, Oklahoma City-Ada-Atoka Railway Company and St. Louis-San Francisco Railway Company (J. M. Kurn and Frank A. Thompson, trustees), for the refund of freight collected on cement shipments in excess of the rate such Corporation Commission held was the lawful rate in force at the time such charge was made. The railroads appeal.

The amount of cement shipped by the cement company over the roads in question, during the period of time involved, is not disputed. The freight charged at the time of shipment was at the rate the railroads involved claim was the lawful rate in force at that time. Judgment was rendered on the basis of the rate contended for by the cement company. There is no dispute as to the amount of the recovery in the event judgment is for the cement company.

The rate involved is on cement between Ada and Marion, Oklahoma. Marion is a station on the Oklahoma City-Ada-Atoka Railway main line, slightly south and a few miles east of Oklahoma City, Oklahoma. Although established as a station for many years it had fallen into disuse and was not reactivated until the Air Force Base, now known as Tinker Field, was established in the same vicinity.

Prior to July 11, 1922, the trackage now comprising the Oklahoma City-Ada-Atoka Railway was owned or controlled by the Missouri-Kansas-Texas Railway Company. On January 5, 1924, such trackage was purchased by one H. R. Hudson, and finally the property was transferred to Oklahoma City-Ada-Atoka Railway Company, on September 8, 1930.

On July 11, 1922, the Oklahoma Portland Cement Company filed with the Corporation Commission a complaint against the Receiver of the Missouri-Kansas-Texas Railway Company, involving the reasonableness of rail rates on cement moving in carloads. Similar complaints were filed, either by this cement company or by other interested persons, against all the principal railroads in Oklahoma. These various matters were consolidated for hearing by the Corporation Commission, and on February 23, 1924, the Commission issued its order No. 2361, prescribing a

mileage scale of rates for cement moving in carload lots, to all points in Oklahoma, other than Dewey. This mileage scale of rates established a rate of 12 cents per 100 pounds from Ada to Marion, Oklahoma. After the adoption of this rate, and on May 6, 1924, the Oklahoma City-Ada-Atoka Railway Company began operating the trackage in question. On May 26, 1924, such railway company duly adopted the tariffs and rates theretofore filed with the Corporation Commission covering this line. The O.C.A.A. carried Marion as a station at this tariff rate in its traffic publication until April 28, 1937, at which time it abandoned such station in its tariff publication.

Thereafter, on February 24, 1941, the O.C.A.A. wrote the U. S. Air Corps a proposal agreeing to construct additional trackage at the site and "further agreed that rates and ratings applicable to this activity will not in any case exceed the net cash rates applicable to Oklahoma City, Oklahoma (where land grant deductions apply) except on low grade commodities, such as sand and gravel, crushed stone, slag, or brick and tile, used for construction purposes, moving on commercial or Government bills of lading which may be handled on distance or commodity tariff." This proposal became an agreement between the Government the O.C.A.A. All the Oklahoma railroads, then acting through their legal representative, filed a petition with the Oklahoma Corporation Commission asking for approval of this rate agreement. Acting on this request, and on April 28, 1941, the Corporation Commission addressed a letter to the representative of the Oklahoma railroads acknowledging that it was advised of the proposed establishment of the army bomber repair plant at the Marion station, and of the agreement between the railroads and the United States Government. The letter further acknowledged the railroads' request for authority to amend their tariffs to comply with this agreement and then provided:

"There is no railroad station now located between Oklahoma City and the new station, Marion, and the practical effect of those tariff amendments is to put Marion within the railroad limits of Oklahoma City, Oklahoma, except on shipments to and from Marion, on one hand, and to and from Oklahoma City, on the other hand. As above stated, this is a United States Government activity and the general public will have little interest directly, in the rates applicable to and from such activity, and the arrangements having been made by the Government, on the one hand, and the railroads, on the other, this Commission is of the opinion, under the provisions of the Constitution of this State, that such arrangements should be approved. Oklahoma railroads be and they are hereby authorized to issue, file, and make effective, on one days notice to the public and this Commission, necessary tariffs or supplements to tariffs which shall provide for the application at Marion, Oklahoma, a point on the Oklahoma City-Ada-Atoka Railroad, of the rates and ratings, whether commodity or mileage, that apply to or from Oklahoma City, Oklahoma, except that such arrangements may be restricted as to shipments of low grade commodities, such as sand, gravel, crushed stone, slag, brick and tile and on all shipments moving locally between Marion and Oklahoma City.

"All tariffs issued hereunder shall bear reference to this Commission's authority B-001737-4 of April 28, 1941. This authority shall be in full force and effect on or after this date."

Following this the O.C.A.A. published its tariff announcing that:

"Rates from or to Oklahoma City, Okla., will be protected from or to Marion, Okla., on the O.C.A.A., except that this rule does not apply to or from Oklahoma City, Okla. Note—Will not apply on sand, gravel, crushed stone, slag, brick tile or chatt."

Based on this tariff the O.C.A.A. and Frisco charged the Oklahoma City rate of 13 cents per hundred on cement from Ada to Marion, instead of the former mileage rate of 12 cents.

The Corporation Commission found its Authority No. B-001737-4, issued on April 28, 1941, was an approval of the arrangement between the railroads and the United States Government, and was for the purpose of putting the Oklahoma City rates in force at Marion, with the exception of certain items of low grade commodities, to be used in the construction of buildings and in grading and paving the site. Among those enumerated were sand, gravel, crushed stone, slag, brick and tile, and the Commission found that the use of the term "paving" in connection with these other terms in the government-railroad negotiations, included cement, as a necessary ingredient to be used with the sand, gravel and crushed stone. The Corporation Commission therefore found that such authority did not authorize the carriers to charge and collect the Oklahoma City rate on cement shipped from Ada to Marion, Oklahoma.

The plaintiffs in error complain this is a suit for damages or reparation. The authority of the Commission is determined by 17 O. S. 1941 §121, which provides:

"The Corporation Commission is hereby vested with the power of a court of record to determine: First, the amount of refund due in all cases where any public service corporation . . . charges an amount for any service . . ., in excess of the lawful rate in force at the time such charge was made, . . ."

In St. Louis-S. F. Ry. Co. v. State, 155 Okla. 236, 8 P. 2d 744, we held that the Corporation Commission was without power to award reparations for payments on freight shipments where the charges, when made, were in accordance with the rates therefor fixed by the Corporation Commission. The answer to the jurisdictional question therefore depends upon whether a charge has been made in excess of the fixed rate.

The fixed rate at the time of the shipments in question was undoubtedly the 12 cent rate contended for by the cement company, unless the same was fixed at a higher rate by authority B-001737-4, supra. This authority was the validation of an agreement made between the United States Government and the railroads in question. Its express purpose as shown by the letter from the railroad to the Chief of the Air Corps was to establish rates which would not exceed the rate to Oklahoma City. Its apparent purpose was to procure a reduction in rates rather than an increase. And, as further shown by the letter to the Air Corps, low grade commodities, such as sand and gravel, crushed stone, slag, or brick and tile, used for construction purposes, were specifically excepted from the order, and they were to continue to move on distance or commodity tariff. This authority was for the purpose of permitting this agreement to take effect. It was not an order fixing rates within the contemplation of art. IX, §18, Oklahoma Constitution. It contains no findings on which such rate orders are made, as required in Midland Valley R. Co. v. State, 24 Okla. 817, 104 P. 1086. It was not based upon notice, as is required of a general rate order under art. IX, §18, Oklahoma Constitution. We therefore conclude it was not a rate-fixing order, but a permissive authority to carry out the special wartime agreement made between the Government and the railroads.

On the other hand, the Corporation Commission found that cement was a low grade commodity, such as sand, gravel, crushed stone, slag, brick and tile, and was therefore in the exceptions to Authority B-001737-4. That cement is a low grade commodity for shipping purposes appears established.

"Cement is a low grade commodity which is usually loaded to the maximum capacity of the cars used." 87 I.C.C.R.P.T. 462.

The carriers cite and rely on Application of Central Airlines, Inc., 199 Okla. 300, 185 P. 2d 919, as supporting its construction that, "low grade com-

modities, such as sand, gravel, crushed stone, slag, brick and tile" limited the low grade commodities to those specifically specified. The case cited construes section 34, art. IX, of the Oklahoma Constitution, wherein the language, "the term 'transportation company' shall include" was held limited to the particular ones therein specified. That case is clearly distinguishable from the one at bar.

It will be noted also that the authority from the Commission does not specifically except such commodities from the agreement, but provides that "such arrangements *MAY* be restricted as to shipments of low grade commodities." Apparently, therefore, this authority leaves the question of the application of the Oklahoma City rate on such shipments open to the possibility of further agreement between the Government and the railroads.

We therefore conclude the Corporation Commission did not err in holding the commodity, cement, was not included in its Authority B-001737-4.

It is also contended that the O. C. A. A., was not a party to the earlier proceedings establishing the 12 cent rate and is therefore not bound by it. Its predecessor in the operation of the trackage involved was a party to such proceedings, and after the O.C.A.A. acquired the trackage it published and adopted these rates. The position of the carrier on this issue is untenable. If such holding was adopted the carrier would be in the position of transporting a commodity on which no rate had been established. Under authority of Atchison, T. & S. F. Ry. Co. v. State, 85 Okla. 223, 206 P. 236, in such a situation the Corporation Commission would have authority to compel a refund of any excess charge.

The carriers next contend that even if the 13 cent rate was erroneous that it was published in the tariffs of the railroads, and, therefore, as the published rate was the legal rate. If it was such legal rate it is their con-

tention the Corporation Commission is without jurisdiction under 17 O. S. 1941 §121. Numerous authorities construing the published rates of carriers operating under the Interstate Commerce Commission are cited. We are not here, however, dealing with published rates under the Interstate Commerce Commission. The Constitution of Oklahoma, art. IX, § 18, requires the Corporation Commission to fix the rates. 17 O. S. 1941 §121 vests the Corporation Commission with power to order refunds in the event the rate charged is in excess of the lawful rate in force at the time such charge was made. This statute obviously could refer only to the lawful rate fixed by the Corporation Commission.

Complaint is also made that the cement company has based its contracts and bids with the Government on the 13 cent freight rate which it has been required to pay, and that therefore it has sustained no actual loss in the premises and should not be entitled to recover from the carriers. The cement company has paid the excessive rate. The fact that it used such rate in computing its bids would appear to be no defense available to the carriers.

It is further contended that the decision of the Corporation Commission in 1950, was retroactive and established a rate then which was retroactive to the time the shipments were made some years earlier. The views we have expressed on the other points above set out appear to have fully answered this issue.

Finally, it is urged the cement company cannot recover because it participated in the acts complained of and therefore has sustained no injury. In support of this position the case of Mangum Electric Co. v. Border, 101 Okla. 64, 222 P. 1002, is cited. That was a tort case in which one participant sought to recover damages against the other. There is no evidence here that the cement company assented to the rate charged. It was not notified and

did not participate in the proceedings which caused the company to change the rate. It simply paid the charge which was exacted from it in order to move the freight. We fail to see how that could be any such voluntary participation in the transaction as would bar its recovery of any illegal freight charged.

The judgment of the Corporation Commission is affirmed.

ARNOLD, C. J., and WELCH, CORN, DAVISON, and JOHNSON, JJ. concur. HALLEY, V.C.J., and GIBSON and O'NEAL, JJ., dissent.

GIBSON, J. (dissenting). I cannot concur in the majority opinion.

This is an action filed by Oklahoma Portland Cement Company against the two railway companies (now plaintiffs in error) for refund of alleged excessive freight charged and collected on carload shipments of cement from Ada to Marion, Oklahoma. Judgment for Portland, and railroads appeal.

The proceeding is brought and jurisdiction asserted under Tit. 17 O. S. 1941 §121. Construed in Atchison, T. & S. F. Ry. Co. v. State, 85 Okla. 223, 206 P. 236, holding commission to be vested with authority to compel a refund of excess charged above the lawful rate.

There are several important dates in the history of this case. February 23, 1924, Order 2361 was issued by the Corporation Commission prescribing a mileage scale of rates for cement moving in car lots. May 26, 1924, the rate was established at 12c per 100 pounds Ada to Marion. February 24, 1941, Oklahoma City-Ada-Atoka Railway Company submitted its letter to United States Air Corps. This proposal was accepted by the Government. April 28, 1941, Commission Authority B-001737-4 issued establishing the station of Marion on basis of Oklahoma City rates, with the exceptions noted therein; June 10, 1941, in compliance with the Commission's order tariffs were published

fixing the Oklahoma City rate of 13c for cement to Marion. February 7, 1942, Portland began shipping cement and paying freight at 13c. April 8, 1944, Portland's last shipment. June 8, 1944, complaint filed by Portland claiming a refund of 1 cent per 100 pounds. October 6, 1944, Commission heard evidence and took the cause under advisement. Nothing further was done until the cause was set for oral argument on July 1, 1949. On January 19, 1950, the Commission amended the Authority by its order 23289 specifically including "cement", in the specified commodities excepted in the Authority B-001737-4. On June 15, 1950, Commission entered judgment against Oklahoma City-Ada-Atoka Railway Company for $9398.47, and against Frisco for $570.23, with interest at 6% from April 10, 1944.

The letter agreement of February 24, 1941, states:

"Further agreed that rates and ratings applicable to this activity will not in any case exceed the net cash rates applicable to Oklahoma City, Oklahoma (where land grant deductions apply) *except on low grade commodities such as sand and gravel, crushed stone, slag, or brick and title* used for construction purposes moving on commercial or Government bills of lading which may be handled on distance or commodity tariff."

On February 28, 1941, the Commission issued its Authority B-001737-4, which provides:

"Oklahoma railroads be and they are hereby authorized to issue, file, and make effective, on one day's notice to the public and this Commission, necessary tariffs or supplements to tariffs which shall provide for the application at 'Marion', Oklahoma, a point on the Oklahoma City-Ada-Atoka railroad, of the rates and ratings, whether commodity or mileage, that apply to or from Oklahoma City, Oklahoma, except that such arrangements may be restricted as to shipments of low grade commodities such as sand, gravel, crushed stone, slag, brick and tile and on all shipments moving locally between 'Marion' and Oklahoma City."

The tariffs were accordingly published and cement was not included in the low grade commodities excepted from the application of the Oklahoma City rate to Marion.

Defendant railroads invoke the rule of construction "ejusdem generis", and cite Application of Central Airlines, Inc., 199 Okla. 300, 185 P. 2d 919. Therein we quoted from 59 C. J. §980:

"So words of general import in a statute are limited by words of restricted import immediately following and relating to the same subject."

Numerous other cases are cited in contending that the meaning of "low grade commodities" in the Authority is limited to the things "sand, gravel, crushed stone, slag, brick and tile", and that "cement" not being named is not included with the commodities which were excluded from the application of the Oklahoma City rates.

There is merit to this contention. Application of Central Airlines, Inc., supra; Ex parte Amos, 93 Fla. 5, 112 So. 289; City of Tulsa v. Southwestern Bell Telephone Co., 75 F. 2d 343; Ex parte Carson, 33 Okla. Cr. 198, 243 P. 260.

The commodities sand, gravel, crushed stone, slag, brick and tile named in the exception are largely competitive with each other. Their manner of shipping and the use of cars in their transportation are similar. Under the evidence they can be shipped in open cars and left exposed to weather conditions without damage. Not so with cement, which must be shipped in closed cars and protected from the weather. Surely, when considering shipping rates, and considering the extra care necessary to its transportation, cement should not be classified within the excepted commodities in the absence of a statute or order declaring such inclusion. Its inclusion should not be by implication. Therefore in my opinion, the rule of construction known as "ejusdem generis" should be held to apply in this case.

Defendant railroads further say that the action of the Commission in attempting to amend its order establishing rates in 1941 by the order complained of entered in 1950 is in effect retroactive legislation, violating the carrier's constitutional rights which had long since become vested. I agree with this argument.

In Authority B-001737-4, April 28, 1941, the Commission authorized Oklahoma railroads to issue, file and make effective on one day's notice to the public and to the Commission necessary tariffs or supplements to tariffs, which shall provide for the application at Marion, Oklahoma, of the rates and ratings, whether commodity or mileage that apply to or from Oklahoma City with the exception above noted. This was done, and the tariffs published provided a rate of 13c to and from Oklahoma City. The United States Government, the Commission, the railroad carriers, the shippers, and all who dealt in shipments to Marion on this project, accepted and recognized that rate as the legal rate. It was the legal rate because it was the only rate that the carriers could charge. It is not contended that they charged more. During the construction of the Tinker Field project, and between February, 1942 and April, 1944, Portland shipped more than 1,000 cars of cement and paid the freight at the 13c rate. No complaint was made by Portland until the filing of the complaint herein on June 8, 1944.

In Community Natural Gas Co. v. Corporation Commission, 182 Okla. 137, 76 P. 2d 393, this court, quoting from Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 53 L. Ed. 150, said:

" 'But we think it equally plain that the proceedings drawn in question here are legislative in their nature, and none the less so that they have taken place with a body which, at another moment, or in its principal or dominant aspect, is a court such as is meant by sec. 720. A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and

under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind, as seems to be fully recognized by the Supreme Court of Appeals.' "

Plaintiff in error says:

"The theory for this inhibition is stated in Michigan Bell Telephone Co. v. Michigan Public Service Commission, 315 Mich. 533, 24 N. W. 2d 200, at 206, 209, where it is said:

" 'The impropriety and invalidity of the order of December 28, 1944, on this ground (i.e., that it is in effect retroactive) should be clear. For the State to prescribe utility rates, forbid the utility to charge any other rates, and then say that those rates may be declared unjust and unreasonable as applied to executed transactions shocks the conscience. Under such a rule how could the utility order its affairs? If an order may be made retroactive for one year, why not for any period (in the absence of a statute of limitations) and what then becomes of the commitments the utility may have made in the belief that the sums it has earned and collected belong to it? Reason, common fairness and precedent combine to establish the rule that the charter of the commission's powers should not be construed to permit it to impugn its own legislative acts with retroactive effect unless the statutes affirmatively require such a construction.' "

The Michigan court further said:

"The principal matter to be determined in this appeal is the earliest date from which reparations may be allowed on account of any claims made in this proceeding. . . . A commission-made rate furnishes the applicable law for the utility and its customers until a change is made by the commission. The utility was entitled to rely on the order of 1931 (which originally fixed the rate) until August 30, 1935 (the date of the commission's order fixing lower

rates), but thereafter might be liable for reparations."

Up to the time of the decision in this case in May, 1950, there had been no reduction in the rate, which was filed and published under the Authority of April 28, 1941. The effect or net result of reducing the rate on cement (without an application or hearing on reduction) was accomplished, however, by Commission Order No. 23289, which declared "cement" to be included in the commodities excepted in the Authority. This order was not entered until January 19, 1950. Order 23289 is an amendment to Authority B-001737-4. If by any reasoning it can be said that Order 23289 operated to reduce the rate established under the Authority from 13c to 12c, then certainly the judgment rendered could be a refund only of the excessive charges made from and after January 19, 1950, the effective date of the Order making the reduction.

Art. IX, § 18, of the Oklahoma Constitution, specifically granted to the Commission the power to amend its rates, charges, classifications, rules, etc. In its final order the Commission held that it had authority to amend Order No. 2361.

The carriers asked the Commission to amend its tariffs so that the rates applicable at Marion would not exceed the rates applicable to Oklahoma City. Authority B-001737-4 was intended as an amendment to the former rates established. The new rate on cement was published. "The parties could not by contract or otherwise vary this rate." Missouri, etc., R. Co. v. Harriman, 227 U. S. 657, 57 L. Ed. 690.

"As the carrier, shipper and consignee are bound by the published schedules of rates, the court is likewise bound thereby in determining the rights and liabilities of the parties." Woodrich v. Northern Pac. Ry. Co., 71 Fed. 2d 732.

The rate collected here was the rate published under the Authority of the Commission by virtue of its power to

amend existing rates. It was the authorized rate and the only one in the tariffs. It was the only rate on cement which could be collected. The charge made was not a rate "in excess of the lawful rate in force at the time such charge was made", as provided in Tit. 17 O. S. 1941 §121, under which Portland's claim is asserted.

"A commission made rate furnishes the applicable law for a utility and its customers until a change is made by the public utility commission." Cheltenham & Abington Sewerage Co. v. Pennsylvania Public Utility Commission, 344 Pa. 366, 25 Atl. 2d 334.

"A freight rate which has been filed, approved, and published by the Railroad Commission is the lawful rate, *even though unreasonable,* and is the only rate which the carrier can charge without violating the statutes and penal laws; and, where a carrier has charged such rates, the shipper is not entitled to recover as for any excess charges, nor for penalties accruing under code 1907, secs. 5553, 5554." T. R. Miller Mill Co. v. Louisville & N. R. Co., 207 Ala. 253, 92 So. 797.

"Where carrier merely collected intrastate rate authorized by State Corporation Commission, Commission held without authority to order reparation, though rate prescribed and charged was found excessive.

"Provision authorizing Corporation Commission to require reparation for excessive charges applies only where carrier has enforced rates in excess of those prescribed by Commission." El Paso & S. W. R. Co. v. Arizona Corporation Commission, 51 Fed. 2d 573.

" . . . The carrier's right to the published rate at the time it was collected was its property. Can the carrier now be compelled to refund any part of it in view of the constitutional inhibition that no person shall be deprived of his property without due process of law?" State ex rel. v. Public Service Commission of Kansas, 135 Kan. 491, 11 P. 2d 999.

In the last-mentioned case the question was answered in the negative, as to transactions had prior to the passage of the Act but was upheld as to transactions had after its effective date.

The majority opinion is predicated on the theory that rates on cement were fixed pursuant to Order 2361, made February 3, 1924, and have stood without change. Authority of April 28, 1941, is not recognized as an amendment to any former rate-fixing order although it was adopted by the Commission and new tariffs were drawn pursuant to the order of the Commission and such new tariff fixed certain rates and applied the Oklahoma City rates to Marion. It was intended as an amendment to former rates. It was acted upon by carriers and shippers under the published rates. It is said that the Authority contains no findings, as required, and was not based on required notice, and was therefore not an order fixing rates within the contemplation of art. IX, §18 of the Oklahoma Constitution.

But this same section defines the powers and duties of the Commission, authorizes the Commission to establish rates and grants power to amend or alter such rates, from time to time.

The Commission is presumed to have acted lawfully and to have performed such duties as necessary under law for it to promulgate the order and its rate, when fixed, is deemed as prima facie just, reasonable and correct. Atchison, T. & S. F. R. Co. v. State, 82 Okla. 288, 200 P. 232. Therefore, the rate established pursuant to the Authority was the authorized rate until amended or altered, and the charges made by the carriers were lawful charges so long as they did not exceed the newly authorized rate.

The foregoing authorities concern the remedy sought, and these interpretations of the law with reference to the remedy are not in conflict with the constitutional provision.

I am of the opinion that the Commission had no jurisdiction to enter its judgment for refund on any ship-

ments made prior to January 19, 1950, when by its order No. 23289 it included "cement" as one of the common commodities excepted under the Authority.

I am of the further opinion that the relief sought is based on a claim for damages by reason of a tort allegedly committed by the carriers. Portland contends that it has been damaged to the extent of the difference between the published and collected rate and the rate which it says was the legal rate. It seeks recovery of an illegal and excessive charge made by the carriers. Defendants in error in their brief so state.

"The recovery of an illegal charge made by a carrier under statute is on tort committed by carrier in making such charge." Central of Georgia Ry. Co. v. West Virginia Pulp & Paper Co., 92 F. 2d 892; Lewis-Simas-Jones Co. v. Southern Pacific Co., 283 U. S. 654, 75 L. Ed. 1333.

Since the action was grounded on tort and not on contract, the claim was unliquidated until reduced to judgment. The order allowed 6% interest for nearly six years prior to the date of its entry. Such judgments bear interest from the date on which they are rendered. Tit. 15 O. S. 1941, § 274.

While there is no separate assignment of error involving the question of interest allowed on the judgment, plaintiffs in error attack the whole judgment, as hereinbefore shown, and of course it is contended that the whole judgment, and each and every part thereof, including interest, is erroneous.

I can see no legal reasons for sustaining the Commission's judgment. Certainly good morals do not require it. Portland, in pricing its products to the consumer, did so upon the assumption that 13c per 100 pounds of cement was the correct rate. It has lost nothing. To sustain the judgment is merely to increase Portland's profits from the transaction.

I respectfully dissent.

O'NEAL, J., concurs in these views.