26 F.3d 839
 REDWOOD VILLAGE PARTNERSHIP, an Illinois Partnership; Appellant;
v.
John GRAHAM; Blaine Nordwall; Robert Wanner; Barb Howe;
Don Johnson; Charles Ehrhardt, in their
individual capacity; Appellees.
REDWOOD VILLAGE PARTNERSHIP, an Illinois Partnership; Appellee;
v.
John GRAHAM; Blaine Nordwall; Robert Wanner; Barb Howe;
Don Johnson; Charles Ehrhardt, in their
individual capacity; Appellants.
 Nos. 93-2413, 93-2495.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 17, 1994.
Decided June 9, 1994.
 
 Erwin Chemerinski, Los Angeles, CA, argued (Laroy Baird, Bismarck, ND on the brief), for appellant.
 Charles S. Miller, Jr. Bismarck, ND, argued, for appellee.
 Before HANSEN, Circuit Judge, and HEANEY and JOHN R. GIBSON, Senior Circuit Judges.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Redwood Village Partnership, owner of a basic care facility, brought this action for money damages under 42 U.S.C. Sec. 1983 against six employees of the North Dakota Department of Human Services,[1] alleging that their promulgation of administrative regulations violated the partnership's rights under the Constitution. The district court granted summary judgment for the state employees on the ground of absolute immunity. 819 F.Supp. 867. We affirm.
 
 I.
 
 2
 Redwood Village, Inc., was a state-licensed, basic care facility located in Wilton, North Dakota, and owned by Mr. and Mrs. John Hruby. In 1984 the Hrubys sold the facility to Redwood Village Partnership ("Redwood"), an Illinois limited partnership which was created for the purpose of buying the facility. Redwood's two general partners were the facility's accountant, who lived in Bismarck, North Dakota, and an Illinois attorney. The Hrubys continued to manage the facility after the sale.
 
 
 3
 This controversy arose from a disagreement between Redwood and the North Dakota Department of Human Services over the state's rate of reimbursement for the care of residents receiving public assistance. These "public pay" residents constituted the majority of the facility's residents. Shortly after buying the facility, the partnership applied to the Department for reimbursement for the period from July 1, 1985, through June 30, 1986. The reimbursement rate is based on a facility's allowable costs, including depreciation and interest costs. See N.D.Admin.Code Ch. 75-02-07. Redwood requested a rate of reimbursement based on the purchase price of the facility. The Department, however, determined that the rate should be based on what a prudent and cost-conscious buyer would have paid rather than the actual purchase price. The Supreme Court of North Dakota ultimately resolved the issue, holding that the Department's calculation of depreciation was appropriate but that it misapplied its regulations concerning allowable interest costs. Redwood Village Partnership, Ltd. v. North Dakota Dep't of Human Servs., 420 N.W.2d 333, 339 (N.D.1988). The court remanded the case to the Department for recalculation of the reimbursement rate for the Redwood Village facility for the 1985-86 fiscal year.
 
 
 4
 Redwood continued to receive reimbursements according to the supreme court's interpretation of the regulations until the Department proposed new reimbursement rules for basic care facilities through a formal rulemaking process. The proposed rules, with an effective date of July 1, 1989, were largely patterned on existing rules for long-term care facilities. See Preamble for Proposed Amendments to N.D.Admin.Code Ch. 75-02-07, Joint Appendix at 204. Redwood submitted written objections in November 1988 during the comment period of the rulemaking process. After adoption of the rules, however, Redwood did not seek judicial review of the rule changes to challenge their legality. Instead, Redwood sold the facility back to the Hrubys on June 30, 1989, allegedly at a loss, just before the effective date of the new rules. Thereafter Redwood brought this action for money damages against six Department officials involved in promulgating the rules.
 
 II.
 
 5
 Redwood's complaint alleged that three of the new regulations were adopted specifically to apply retroactively to Redwood alone in order to circumvent the decision of the North Dakota Supreme Court. Those rules concerned the treatment of interest and depreciation expenses when calculating the reimbursement rate for "public pay" residents, and recapture of depreciation upon sale of the facility. See N.D.Admin.Code Secs. 75-02-07-04(7), 75-02-07-04(8), 75-02-07-05(7). The partnership claimed that the arbitrary retroactive rulemaking violated its Fourteenth Amendment rights to due process and equal protection, the takings clause of the Fifth Amendment, and the privileges and immunities clause of article IV, section 2 of the Constitution. Redwood asserted that the executive officials were entitled to only qualified, not absolute, immunity for their administrative rulemaking.
 
 
 6
 The sole issue we are called upon to decide is whether the Department officials are absolutely immune from federal damages claims for their promulgation of rules. The only conduct complained of is the rulemaking itself; there was no application or enforcement of the rules against Redwood because it sold its basic care facility before the amended rules came into effect. We review de novo the district court's determination that the Department officials were absolutely immune from liability for damages. See Brown v. Griesenauer, 970 F.2d 431, 434 (8th Cir.1992).
 
 
 7
 The Supreme Court has adopted a functional approach to questions of immunity. Harlow v. Fitzgerald, 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982). "Absolute immunity flows not from rank or title or 'location within the Government' but from the nature of the responsibilities of the individual official." Cleavinger v. Saxner, 474 U.S. 193, 201, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985) (quoting Butz v. Economou, 438 U.S. 478, 511, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978)). The critical inquiry is the nature of the official's function in a particular proceeding, not the identity of the actor who performed the function. See Forrester v. White, 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988); Brown, 970 F.2d at 436. The nature of a proceeding, in turn, "depends not upon the character of the body but upon the character of the proceedings." Brown, 970 F.2d at 436 (quoting District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 477, 103 S.Ct. 1303, 1312, 75 L.Ed.2d 206 (1983) (citation omitted)).
 
 
 8
 The rulemaking undertaken by the Department officials was legislative in nature. Legislation "looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." Brown, 970 F.2d at 437 (quoting Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)). The three rules that Redwood specifically complained of apply by their terms to all basic care facilities. During the rulemaking comment period, the proposed rules elicited responses from several basic care facilities, including Redwood Village, concerning the impact of the proposed rules on their operations. The new reimbursement rate formula applied only to payments made beginning with the 1989 fiscal year. While the challenged regulations do have an element of retroactivity in that they use June 1, 1984, as a baseline date when calculating the basis for depreciation and interest expenses and determining depreciation costs that are subject to recapture if the facility is later sold at a price exceeding the undepreciated value, these regulations apply generally to any facility that is sold after the effective date of the regulations.
 
 
 9
 Redwood urges us to adopt the language and holding of the Fifth Circuit in Walter v. Torres, 917 F.2d 1379, 1383 (5th Cir.1990), which concluded that a parole board's enactment of rules was an "administrative" function which entitled the board members only to qualified immunity. The characterization of rulemaking as "administrative" does not assist us in analyzing the immunity question under a functional approach, however. See Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980) (state supreme court's enactment of state bar disciplinary code was act of "rulemaking" performed in "legislative" capacity). Nor is this characterization bolstered by Redwood's statements that the Department's new rules in essence govern ratesetting, and ratesetting is a classic executive function. See Prentis, 211 U.S. at 226, 29 S.Ct. at 69 ("The establishment of a rate [by the Virginia State Corporation Commission] is the making of a rule for the future, and therefore is an act legislative" in nature.) We agree instead with the reasoning of the District of Columbia Circuit in Jayvee Brand, Inc. v. United States, 721 F.2d 385 (D.C.Cir.1983), which considered a damages claim against five former members of the Consumer Product Safety Commission. Noting that "[l]egislation is a function entitled to absolute immunity, with the immunity following the function and not the office," the court stated that "it is clear that when an agency exercises quasi-legislative regulatory authority, action for money damages against agency members will not lie." Id. at 395 (citations omitted). We likewise hold that the Department officials who promulgated the amended rules for basic care facilities are absolutely immune from suit for damages.
 
 
 10
 Redwood contends that a major reason to reject absolute immunity from damages liability here is that according "legislative" immunity to executive officials for their rulemaking would also bar any action for declaratory or injunctive relief. The partnership cites Consumers Union to support this proposition. We disagree with Redwood's reading of that case. When discussing Consumers Union in its Forrester decision, the Supreme Court clearly limited the concept of "legislative" immunity to the rulemaking act itself:
 
 
 11
 In explaining why legislative, rather than judicial, immunity furnished the appropriate standard, we said: "Although it is clear that under Virginia law the issuance of the Bar Code was a proper function of the Virginia Court, propounding the Code was not an act of adjudication but one of rulemaking." (Citation omitted.) Similarly, in the same case, we held that judges acting to enforce the Bar Code would be treated like prosecutors, and thus would be amenable to suit for injunctive and declaratory relief. (Citation omitted.) Once again, it was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis.
 
 
 12
 Forrester, 484 U.S. at 228-29, 108 S.Ct. at 545. The absolute immunity we confer upon the Department officials is for their conduct of rulemaking. Suits for declaratory and injunctive relief are still available to challenge regulations.
 
 
 13
 We recognize the tension between the "interest in having governmental officials exercise their judgment free of the fear of burdensome litigation" and the "interest in checking improper official conduct and in providing wronged individuals with adequate remedies for their injuries." Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607, 712 (8th Cir.1980). The threat of damages liability not only encourages officials to carry out their duties in a lawful manner, but also "can create perverse incentives that operate to inhibit officials in the proper performance of their duties." Forrester, 484 U.S. at 223, 108 S.Ct. at 542. We conclude that exposure to liability for monetary damages would unduly inhibit executive officials when carrying out the quasi-legislative act of rulemaking. We therefore hold that executive officials are absolutely immune from suits for money damages under section 1983 for their promulgation of rules, and we affirm the judgment of the district court.
 
 
 
 [1]
 John Graham was executive director of the Department, Blaine Nordwall was an assistant attorney general serving as chief legal counsel for the Department, and Robert Wanner, Barb Howe, Don Johnson, and Charles Ehrhardt were Department employees